## RUBY C. HALE'S APPEAL FROM PROBATE.

First Judicial District, Hartford, May Term, 1897.    ANDREWS, C. J.,
TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

After prescribing how intestate estate should be distributed among the
children, a statute (General Statutes, Rev. of 1875, p. 372, § 6) provided
that if the real estate could not be divided among all the children,
without great inconvenience, it might be set to the eldest son, or, on
his refusing, to the other sons, successively, he paying to the other
children their proportional shares of its appraised value, or giving them
security for such payment within the time limited by the Court of Pro-
bate.    The next section (§ 7) provided that if any minor child should
die before marriage, and before any legal disposition of the estate, the
portion of such deceased child should be equally divided among the
surviving children, and their legal representatives.    *Held* that § 7,
which was originally a part of § 6, was to be construed in connection
with such section and as supplementary to it; and that so construed
it was not a statute of descent, constituting an exception to the general
law as established in the preceding and following sections of the chap-
ter, but was merely a law of administration regulating the disposition,
under the contingency referred to in § 7, of money paid or payable for
the land set to one of the sons.

Accordingly where *A* died intestate leaving two minor children, each of whom died intestate and unmarried during minority, and before any disposition of *A's* estate had been made, it was *held* that the property descended to the heirs of the minor child who last died, and not to the next of kin of *A* existing at his death.

[Argued May 12th—decided October 5th, 1897.]

APPEAL from an order and decree of the Court of Probate for the District of Hartford ascertaining and determining the heirs at law and distributees of the intestate estate of Susan M. Welles, deceased, taken to the Superior Court in Hartford County and reserved by that court, *Elmer, J.,* upon an agreed statement of facts, for the consideration and advice of this court. *Judgment affirming decree of the Court of Probate, advised.*

The facts as agreed upon by the parties and found by the court, are as follows : " 1. Susan M. Hale, daughter of John M. Hale, married Thomas G. Welles of Hartford, Conn., January 15th, 1873, and died intestate December 18th, 1880, leaving said husband surviving her, and also two sons, John M. H. Welles and Hubert G. Welles, minor sons, and no other children. 2. John H. Welles died April 4th, 1882, a minor and intestate and unmarried. Hubert G. Welles died March 24th, 1892, a minor, intestate and unmarried, and Thomas G. Welles died March 19th, 1892, leaving Hubert G. Welles surviving him, and also a widow, Maud C. Welles, and two sons, Thomas and Samuel Welles. 3. The Security Company of Hartford was duly appointed administrator on the estate of Thomas G. Welles, March 29th, 1892, and was also duly appointed administrator on the estate of Hubert G. Welles, March 30th, 1892. Upon the death of said Susan said Thomas G. Welles was duly appointed her administrator, but did not take any steps to settle her estate, and no distribution of her estate has ever been made. 4. Thomas G. Welles, partly during Susan's lifetime and partly after her death, as her husband and therefore statutory trustee, received large sums of money belonging to her estate amounting to some $20,000. After his death there was no administrator upon her estate until November 10th, 1893, when the Con-

necticut Trust and Safe Deposit Company of Hartford was duly appointed administrator *de bonis non* upon her estate, and received from said Security Company, as administrator of said Thomas G., the said sums which it now holds. The said money came to Susan from the estate of her father, John M. Hale.   5. Susan had sundry brothers and sisters, one of whom, Reuben C. Hale, died intestate March 9th, 1879, leaving a widow and one child, Ruby C. Hale, the appellant, a minor.   6. On the        day of October, 1896, the Connecticut Trust and Safe Deposit Company, as such administrator of Susan, applied to the Court of Probate for the district of Hartford for an order under § 628 of the General Statutes, to ascertain and determine who were heirs and distributees of the said intestate estate of the said Susan, in which proceeding said Ruby C. Hale appeared, having a guardian *ad litem* duly appointed, and claimed to be an heir and distributee of said Susan and her estate, but the Court of Probate decreed that she was not an heir or distributee of said Susan or of her estate, from which decree this appeal was taken; and the question reserved for the Supreme Court of Errors is whether said Ruby C. Hale was or was not an heir of said Susan, and entitled to have a share of said Susan's estate distributed to her, upon the facts as above found."

*Charles E. Perkins*, for the appellant.

Our claim is that as John and Hubert died unmarried and minors, before any distribution of their mother's estate, the share which they would have taken if they had lived until then, never went to them at all, but remained a part of their mother's estate, and is to be distributed as if they had died before their mother.   Gen. Stats. § 631 ; Rev. of 1875, p. 373, § 7; Public Acts of 1885, p. 515, § 199; *In re North's Estate*, 48 Conn. 583; *Nash* v. *Cutler*, 16 Pick. 499; *Crowell* v. *Clough*, 3 Foster (N. H.), 208 ; *Perkins* v. *Simonds*, 28 Wis. 90 ; *Jenks* v. *Trowbridge's Estate*, 48 Mich. 100 ; *Benson* v. *Swan*, 60 Me. 162; *State* v. *Turner*, 49 Conn. 253 ; *Westfield Cemetery* v. *Danielson*, 62 id. 322; *Decoster* v. *Wing*, 76 Me. 450 ; *Goodrich* v. *Adams*, 138 Mass. 552.   There is another view of the

old Act which brings about the same result. The statute relates to the distribution of the estate of the parent from whom the property comes; if at the time of distribution all the children of that parent have died minors and unmarried, neither they nor their heirs have, or have had, any vested interest in that property; they have only a possibility of inheriting, provided they live until the time of distribution; and the case would come within the decision of *Comstock* v. *Gay*, 51 Conn. 63, where the court say that where there is only a possibility or expectancy or capability of inheriting, the legislature has a right at all times, by a general law, to change the course of the inheritance, and deprive such issue of the capability of inheriting. See also *Carpenter* v. *Pennsylvania*, 17 How. 463, and *Armstrong* v. *Armstrong*, 1 Or. 207. In relation to the portion which would have come to Hubert from his mother, if he had lived to the time of the distribution of her estate, that clearly comes under the statute of 1885, as he did not die until 1892.

*George G. Sill* and *Arthur L. Shipman*, for the appellee.

The distribution of an estate depends upon and is governed by the statute in force at the time of the death of the intestate. 24 Amer. & Eng. Ency. of Law, 428; *Messer* v. *Jones*, 88 Me. 349. The subsequent death of John H. Welles and Hubert G. Welles does not affect the present distribution of their mother's estate. The right to equal portions of the estate of their mother, subject to their father's life estate, was a present vested interest in John H. and Hubert G. Welles on Mrs. Welles' death. For certain purposes the title to personal property of an intestate passes to his administrators, but the equitable right vested in the children immediately upon his decease. *Kingsbury* v. *Scovill*, 26 Conn. 349, 352; *Woodhouse* v. *Phelps*, 51 id. 521–523. Section 631 of the General Statutes first appeared in 1699 and has ever since remained in substantially its original form. It was probably taken from Massachusetts and its plain purpose is to prevent the necessity of a second administration and distribution of a minor's estate who left brothers and sis-

ters, and so it has been decided in the latest case in Massachusetts. *Goodrich* v. *Adams*, 138 Mass. 552. The early provincial statute of Massachusetts went into the statutes of Maine, New Hampshire and Wisconsin, as well as Connecticut. In New Hampshire it has been construed in *Crowell* v. *Clough*, 3 Foster, 207; *Prescott* v. *Carr*, 9 id. 453. In Maine, in *Benson* v. *Swan*, 60 Me. 160; *Cables* v. *Prescott*, 67 id. 583; *Decoster* v. *Wing*, 76 id. 450. In the latter case the same rule was applied as in the Massachusetts cases, *viz.*: that the statute was not applicable to the case of a single minor child. The decisions in Wisconsin are to the same effect. *Perkins* v. *Simonds*, 28 Wis. 90; *Wiesner* v. *Zaun*, 39 id. 190; *Cramer's Appeal*, 43 id. 167; *Shuman* v. *Shuman*, 80 id. 479. Applying the doctrine of these decisions and our statute in the Revision of 1875, to this case, John's portion of his mother's estate vested in Hubert upon John's death, just as was decided in Pennsylvania on this same estate (*In re Welles Estate*, 161 Pa. 218); and when Hubert died in 1892, he took both John's interest and his own. *Goodrich* v. *Adams*, *supra; Buckingham* v. *Jacques*, 37 Conn. 403; *Clark* v. *Shailer*, 46 id. 113. In Connecticut the only reported decision is *In re North's Estate*, 48 Conn. 583. JUDGE CARPENTER'S opinion was based upon what might be construed as the Massachusetts doctrine, from the decisions at that time promulgated, but which the court, in *Goodrich* v. *Adams*, expressly repudiated, *viz.*: that the title went back to a dead person.

HAMERSLEY, J. In the case of the *Conn. Trust & Safe Deposit Co., Admr.*, v. *Security Co., Admr.*, 67 Conn. 438, we held that the fund of $20,000 belonging to Thomas G. Welles as statutory trustee of the personal property of his first wife, Susan M. Welles, vested upon his death in those entitled by law to succeed to the intestate estate of his said wife; and that for the purpose of ascertaining the heirs and distributees of that intestate estate in accordance with the method provided by statute, the administrator *de bonis non* upon the estate of said Susan M. Welles was entitled to recover pos-

session of the fund from the administrator of Thomas G. Welles. After that decision the administrator *de bonis non* of Susan M. Welles applied to the Court of Probate, in pursuance of § 628 of the General Statutes, to ascertain who were the heirs and distributees of that intestate estate; and the court ascertained the heirs to have been the children of Susan M. and Thomas G. Welles, *viz.*, John H. Welles who died in 1882, a minor, intestate and unmarried, and Hubert G. Welles who died five days after the death of his father in 1892, a minor, intestate and unmarried; and ascertained the distributee to be the administrator on the estate of Hubert G. Welles. Thereupon the court ordered the administrator *de bonis non* on the estate of Susan M. Welles to deliver possession of the same to the administrator on the estate of Hubert G. Welles; and from this order the appeal to the Superior Court was taken. The question of who may be Hubert's heirs is not involved; the only question is: are Hubert's heirs entitled to the estate now in the hands of his mother's administrator?

It will serve the purpose of clearness to treat the question as if the estate had belonged absolutely to Mrs. Welles at time of her death. The heirs of an intestate are to be determined by the provisions of the statute in force at the time of his death, and each distributive share, as determined by such provisions, vests immediately in the person who has a right to it. Reeve on Descents, p. LXII; *Griswold* v. *Penniman*, 2 Conn. 564, 567; *Roorbach* v. *Lord*, 4 id. 347, 349, *Kingsbury* v. *Scovill*, 26 id. 349, 253; *Hewitt's Appeal*, 53 id. 24, 37; *Messer* v. *Jones*, 88 Me. 349.

Since the organization of our government, the law of descent and of administration has been derived from our own statutes and the practice under them which has become a part of our common law. The law of descent as to real and personal property has been substantially the same, derived from the same general statute, and such distinctions as exist arise mainly from legislation specially affecting real estate, passed since the general law of descent was settled in 1639 (1 Col. Rec., p. 38). So our statute *de* distribution of intestate

estates is at the same time a statute of descent and of administration. As a statute of descent it defines the heirs of an intestate, and vests in those heirs the right of property in his estate at the time of his death. As a statute of administration it prescribes the mode by which possession of the property may be obtained, and postpones the vesting of the strictly legal title in personal property, until possession is given through the process of distribution; the right of property, however, pending distribution, may pass by sale, bequest, or descent.

The statutes in force at the death of Mrs Welles are to be found in the Revision of 1875, Tit. 18, Chap. 11, Art. II, p. 372. The first nine sections of this article are a re-enactment, in slightly different form, of provisions contained in an Act "For preventing of Fraud in concealing any part of the Estate of any Deceased Person," enacted in October, 1699, (4 Col. Rec., p. 306). The few additions appearing in Art. II do not affect the question before us. Section 6 of Art. II establishes the law of descent in case of an intestate leaving children, and by force of that law the right of property in the personal estate of Mrs. Welles vested at her death in her two children then living; the last part of the section provides that when it appears to the court that any real estate cannot be divided among all the children without great inconvenience, it may order the whole to be set to the eldest son, he paying to the other children their proportional shares of the appraised value of such estate, or giving security to such children that he will pay the same with interest in the time limited by the court. Section 7 is as follows: "If any minor child die before marriage, and before any legal disposition of the estate, the portion of such deceased child shall be equally divided among the surviving children, and their legal representatives."

The appellant, Ruby C. Hale, claims that this section is a statute of descent, constituting an exception to the law of descent as established in the preceding and following sections, and by force of this exception the property which, upon the death of Mrs. Welles in fact descended to her children, does,

upon the death of the last survivor, descend to the next of
kin to Mrs. Welles, as of the date of her death, in the same
manner as if her children, in whom for twelve years the right
of property has been vested, had never been born. The
administrator of Hubert Welles claims that § 7 is not a stat-
ute of descent, and that if a statute of descent it does not
apply to this case. Upon careful examination of our stat-
utes and the cases cited, we think the section, if a statute of
descent, does not apply to this case. The section "is only
supplemental" to § 6 (*Terry's Appeal*, 28 Conn. 339, 341), and
by its terms applies alone to a case where there are surviv-
ing children, or at least one surviving child, of the intestate,
or representatives of such child or children, to whom the
estate can descend. An exception to the general rule of
descent cannot be extended beyond its terms. *Goodrich* v.
*Adams*, 138 Mass. 552. But we are also satisfied that § 7 is
not a statute of descent, and our decision should therefore
rest upon this ground.

Sections 6 and 7 are largely identical in language and, so
far as affects the meaning of § 7, wholly identical in substance,
with provisions in the Act of 1699. The language of § 7, as
it appears in that Act, has never acquired a practical con-
struction, and its meaning has never been determined by any
utterance of this court; the nearest approach being a *dictum*
of *Judge Waite* in a personal concurring opinion, when the
opinion of the court held that the statute did not apply to,
and its meaning was not involved in, the case decided. *How-
ard* v. *Howard*, 19 Conn. 313, 317. The meaning of the
language must, therefore, be that attached to it as used in
the Act of 1699. That Act followed an Act of 1698, by
which probate jurisdiction (which from 1639 to 1666 had
been exercised by the General Court through the Particular
Court, endowed for that purpose with the plenary power of
the General Court, and since 1666 by the General Court, the
Court of Assistants, and the County Courts) was for the first
time committed to a separate probate court, and the judges of
the County Courts were constituted as such court "with full
power to act in all matters proper for a prerogative court."

4 Col. Rec. 268. The Act of 1699, as well as other Acts passed at the same session, was probably framed by one of the committees which since 1696 had been engaged in "making new laws and altering former laws" for incorporation in a new revision of the laws which at this time or shortly after was submitted to the General Court, although the printing was delayed until 1702. While drafting the Act the committee doubtless had before them the English statute of distributions, passed in 1670, 22 & 23 Car. II., Chap. 10; as well as an Act for the purpose of establishing the descent of land when any person is "lawfully seized of lands in his own proper right in fee simple," upon the same rules established for the distribution of personal estate, passed in Massachusetts in 1692, shortly after the charter by which that colony became a royal province went into effect. While the language of the Act of 1699, in some provisions, follows that of these Acts, especially of the latter one, the Act as a whole differs in material respects and cannot be treated as an adoption of either. It is simply a fuller and more careful statement of the law of descent and administration, as established by the first order on that subject, and the practice under that order, passed more than thirty years before the English statute of distributions existed; and the most important, if not the only practical, change wrought, lies in the denial to the new probate court of that plenary discretion belonging to the General Court and Particular Court while in the exercise of probate jurisdiction.

Within six months after the organization of a General Court, under the "Fundamental Orders" of 1639, it passed an order establishing the law of descent and administration. Land and personal property were treated alike. The townsmen, or selectmen in each town, were charged with the duty of causing an inventory to be taken when any person died intestate. The General Court, acting ordinarily through the Particular Court, granted administration to the next of kin. Intestate estate descended to wife and children, or next of kin; distribution to be made by the court "as in equity they shall see meet." The custom was, after a session of the

General Court, for the magistrates of the court to attend to distributions, notice thereof being given by deputies in their respective towns. 1 Col. Rec. 38; 4 id. 306. The decisions on these distributions settled the rule determining the proportion in which the estate descended to wife and children, or next of kin. The wife received one third of the land for life and one third of the personal estate (4 Col. Rec., p. 167). The children, including representatives of deceased children, inherited lands and goods in equal shares, except the eldest son who had a double portion; this in accordance with the scriptural, not the English, law of primogeniture. (In the New Haven laws the authority is cited: Deut. xxi: 17; 2 N. H. Col. Rec. 614). The next of kin were determined by the rule of the civil law. Later, stringent laws were passed for calling administrators to account, and for requiring bonds.

While these general rules of descent and administration were determined by the decisions of the court in administering the original order of 1639, and had the force of law, they were nevertheless subject to that discretion to act as in equity they shall see meet, which inhered in all administration of law by the General Court; and, as appears by the record of distributions, were followed more or less closely according to the equities of each case. The Act of 1699, nominally enacted for preventing fraud in concealing the estate of a deceased person, collates the rules thus established for administration by the new prerogative court constituted the year before, and states them with the detail and precision deemed appropriate for that purpose; and, to exclude any implication of discretion in execution, follows its statement of the law with the express prohibition that "in no other manner shall any such estate be distributed to any wife, children or kindred whatsoever." The Act, however, while giving the probate court no discretion in determining the heirs or amount of inheritance, does authorize it to exercise a discretion, as formerly practiced, in the manner of distributing to the heirs the ascertained portions. After stating the law of descent where the intestate leaves children, the Act of 1699 provides that the division of the estate in accordance with

that law shall be made by three freeholders, unless where all the parties interested shall agree upon a division and present the same under their hands and seals to the probate court which agreement shall be accepted and allowed by the court,[1] accounted valid in law, and put upon record; "provided, nevertheless, that where any estate in housing and lands cannot be divided among the children without great prejudice or spoiling of the whole, being so represented and made to appear unto the said court of probates, the said court of probates may order the whole to the eldest sonne, if he accept it, or to any other of the sonnes successively, upon his refusal, he paying unto the other children of the deceased, their equal and proportionable parts or shares of the true value of such houses and lands upon a just apprizement thereof, to be made by three sufficient freeholders upon oath to be appointed and sworn as aforesaid, or giving good security to pay the same in some convenient time as the said court of probates shall limit, making reasonable allowance in the interim not exceeding six per cent. per annum; and if any of the children happen to dye before he or she come of age or be married, the portion of such child deceased shall be equally divided among the survivors." In copying this Act in the record of the October session of 1699, the secretary has placed a period and not a semicolon before the last clause, "and if any of the children," etc.; but in the Revision of 1702, for which the Act had been prepared,—printed under the supervision of William Pitkin, John Chester, and the same secretary,—the clause is preceded by a semicolon, as also in the edition of 1715. It is printed with a semicolon in the Massachusetts Act of 1692. 1 Acts, etc., Province of Mass., p. 43. In the Revision of 1750, the clause remains unchanged, but is printed as a separate paragraph following the proviso. In the Revision of 1784, the language is altered to read as follows: "And if any of the children die before he or she come of age, and before marriage, or before any legal disposition thereof and before marriage, the portion of such child deceased, shall be equally divided among the surviving children, and their legal representa-

tives." In the edition of 1808, the chapter *de* settlement of estates is arbitrarily divided into sections, and the clause appears as a separate section following the proviso. It appears in the same manner in subsequent Revisions, and in that of 1875 in the condensed form above quoted. We do not think these changes in successive revisions have altered the meaning of the clause.

It is very plain that the proviso in the Act of 1699 was not intended to, and did not, alter the law of descent as existing and stated in other parts of the Act. It is simply a device for avoiding an inconvenience in apportioning land among those to whom it had descended in accordance with the law. In effect it authorized the Court of Probate, at its discretion, upon application of those interested and with consent of the eldest son, to sell the real estate for the purpose of dividing the proceeds among the persons to whom it had descended upon the terms mentioned; *i. e.*, paying the value of the land as appraised, either in cash, or in deferred payment protected by good security, in proportionable shares to those entitled to the land ; and included in the terms of the transaction the provision that upon the death of one of the parties, being a minor (whether before the time of the deferred payment, or at any time, is perhaps doubtful), his share, not of any intestate estate, but of the proceeds of the sale of land paid for that purpose and standing in the form of a secured obligation, or cash in the hands of his guardian,— should go to his surviving brothers and sisters, the other parties to the transaction. It is altogether unlikely that the General Court contemplated a possibility of the surviving brothers and sisters not being all the next of kin to such deceased minor; but under one construction of the language it is possible that the division of such sum among the deceased minor's brothers and sisters, children of his father, might not include some half brothers on his mother's side, who at that time and for nearly a century afterwards were next of kin equally with brothers of the whole blood. The existence of such a possibility in a particular case might induce the court to exercise its discretion in not authorizing the trans-

action; but it does not turn the provision into a statute of descent, made in the alternative, depending for its operation on the discretion of the Court of Probate and the assent of a possible heir.    This power of authorizing a sale of land for the benefit of all the children and the survivors of those who might die in infancy, was the only remnant given to the Court of Probate, of that discretionary power to provide for the equities of special cases, so freely exercised by the General Court and Particular Court.    It had been a not infrequent practice in distribution of intestate estates, where there were minor children, to transfer to one of the heirs, and sometimes to a stranger, a portion of the estate in consideration of his obligation to pay, at times limited, the share belonging to each child, dividing among the survivors the share of a deceased minor.    In 1640 the Particular Court, on application of the administrator of an intestate, distributed real estate amounting to £130, to the five children, the amount specified " to be paid into court when each comes to the age of 16 years," and authorized the widow charged with their support, to sell the land, provided she give sufficient security for payment of the children's portions; and "provided also that if any one or more of the children depart this life before they come to the age of 16 years, his or their portion is to be divided equally among those that survive."    *Estate of John Brundish*, 1 Col. Rec. 45.    In 1645 the court settled the land of an intestate on Nathaniel Willette (not an heir), " in consideration whereof he is to pay £40 to the eldest son when he shall attain 21 years of age, and £20 apiece to the three daughters when they shall attain the age of 18 years; if any dye in the meane, the portion is to be divided betwixt the survivors; the land to stand ingadged for the performance thereof."    *Estate of Samuel Wakeman*, 1 Col. Rec. 135.    It was doubtless such ancient practice that suggested the proviso in the Act of 1699.    In accordance with the strong conservatism which has characterized our legislation, this remnant of a prevailing practice when probate jurisdiction was administered by the omnipotent General Court, has been continued through successive revisions, and in that of

1875 appears unchanged in meaning in the proviso contained in sections 6 and 7 under discussion.

This is not a statute of descent. Any practice that may have grown up under it, of including in every case of distribution the portion of a minor child dying between the death of the intestate and distribution, in the estate divided between the surviving children, must be confined to cases where such surviving children are the next of kin to the deceased minor. It is significant that the proviso now claimed as altering the law of descent, is not mentioned by CHIEF JUSTICE SWIFT in his digest, and is nòt referred to by CHIEF JUSTICE REEVE in his careful treatise on descents; that such claim has not been brought to the attention of the court of last resort during the two centuries the proviso has remained on our statute book; and that, so far as known, the general course of descent has never been altered by an application of this proviso, except in a single instance. Some twenty years ago the Court of Probate of the district of New Britain distributed the estate of an intestate minor equally to a brother of the whole blood and two brothers of the half blood; justifying such distribution under this proviso. The case furnished a harsh illustration of the rule preferring kindred of the whole blood, first adopted by our law in 1784. The probate judge, in pursuance of the statute, called to his assistance in the trial a judge of the Superior Court, selecting JUDGE CARPENTER, who at that time was also a judge of this court. A brief memorandum of the grounds of the decision appears in a supplement consisting of two *nisi prius* cases, printed in the 48th volume of Conn. Rep., 584. As appears by the opinion, the learned judges based their conclusions mainly on a number of decisions of courts of other States ; and a mistake naturally followed a misapprehension as to the application of these decisions to our law. The Massachusetts Act of 1692, before mentioned, contained a proviso in the same language as that used in our Act; but that language did not remain substantially unchanged, and in 1805 an Act was passed, different from the law of 1692, and plainly a statute of descent. In *Nash* v. *Cutler*, 16 Pick.

491, CHIEF JUSTICE SHAW bases his opinion upon the clear and precise language of this statute, dismissing from consideration the provincial statutes as "obscure and ambiguous." In 1839 the territorial legislature of Wisconsin adopted the Massachusetts statute of 1805, and the Wisconsin court held that with the statute the construction which had been placed upon it by the Massachusetts courts was also adopted. The New Hampshire statute, in the Revision of 1842, resembles the Massachusetts statute of 1805, and is plainly a statute of descent, and has been so treated by the New Hampshire court. The Maine statute, in the Revision of 1841, is somewhat similar to the Massachusetts statute of 1805, and plainly a statute of descent, and has been so treated by the Maine court.

We have examined the cases in these States with care, and deem unnecessary any comment on their conclusions—not wholly accordant. They all deal with statutes enacted since 1805, which by their terms and without doubt are statutes of descent, and establish an exception, unwise perhaps, to the general law of inheritance. Historically they all may have been developed from the old provincial Act of Massachusetts, the same in language as our Act of 1699; but we find nothing in these decisions to raise any doubt as to the meaning which attached to our law at the time it was enacted. That law remains unchanged in our Revision of 1875, and must have the same meaning.

Some change in the language of the statute *de* intestate estates was made in the revision of the probate law in 1885, incorporated into §§ 630 and 631 of the General Statutes of 1888. Counsel on both sides claim that the changes in these two sections involve no departure from the meaning of the former law. Their claim may be right; but we express no opinion on the question. This case must be governed by the law as it stood in 1875.

We have discussed the case as if the estate left by Mrs. Welles consisted of property owned by her absolutely; in fact it did not. Her estate consisted in an equitable interest in property, the legal title of which was vested in her hus-

VOL. LXIX—40

band as statutory trustee of her personal property, under the statute of 1849. This equitable interest, upon her death, passed to those entitled to succeed to her intestate estate, either by force of the general statute of descent, or by force of the express trust established on the marriage of Mr. and Mrs. Welles, under the statute of 1849. Counsel for Hubert's administrator claim that Mrs. Welles' interest passed to her children as beneficiaries of the trust, in accordance with the terms of the trust under the law of 1849. It is immaterial for the purposes of this case whether the claim is correct or not. In either event the equitable interest passed to her children and became vested in Hubert, who, on the termination of the trust, was entitled to the whole estate; and so in either event, the probate order directing the delivery of possession of the estate to the administrator on Hubert's estate, should stand.

The Superior Court is advised to render judgment affirming the decree of the Court of Probate.

In this opinion the other judges concurred.