PHEBE E. BROWN'S APPEAL FROM PROBATE.
ESTHER MACDONALD'S APPEAL FROM PROBATE.

Second Judicial District, Norwich, May Term, 1899. ANDREWS, C. J.,
TORRANCE, BALDWIN, HAMERSLEY and HALL, Js.

The letter of a statute cannot prevail against the plainly indicated intent
of the legislature.

Section 618 of the General Statutes, originally enacted in 1672, provides
that every woman married prior to April 20th, 1877, and living with
her husband at the time of his death, "or who has been divorced
without alimony, where she is the innocent party, shall have right
of dower, during her life, in one-third part of the real estate of
which her husband died possessed in his own right, unless," etc.
*Held* that this Act must be read and construed in the light of the
conditions it was framed to meet, and in connection with subsequent
modifying legislation (General Statutes, §§ 630, 2803) relating to
descent and distribution and to the remarriage of divorced parties.
Accordingly, where a resident of this State died in 1897 leaving a
widow who was living with him at his decease, and two other
women, formerly his wives, each of whom had in turn obtained a
divorce from him, without alimony, for his misconduct, it was *held*
that neither of the divorced wives was entitled to dower in his
estate.

Whether a lawful marriage after a divorce does not finally sever the
link between the divorced husband and wife which supports her
claim to dower, *quære*.

Argued May 31st—decided August 1st, 1899.

APPEALS from orders and decrees of the Court of Probate
for the district of North Stonington denying petitions for
dower, taken to the Superior Court in New London County
and reserved by that court, *Thayer, J.,* upon a finding of
facts, for the consideration and advice of this court. *Judg-
ment affirming orders of Court of Probate advised.*

These cases were argued as one. Each appellant claimed
dower upon the following state of facts: —

Lucius D. Brown, the decedent, had his domicil in North
Stonington, New London county. He died April 9th, 1897,
possessed of a large amount of land situated in said town
and other towns in this State. He was lawfully married to

the appellant Phebe E. Brown, November 13th, 1858, and was divorced from her, she being the innocent party, on January 20th, 1863. On September 2d, 1864, said Phebe Brown married one W. B. Brown, with whom she is now living and by whom she has six children.

On April 16th, 1864, the decedent, Lucius D. Brown, was lawfully married in this State to the appellant Esther Pierce (whose maiden name was Spink and who had previously been married and divorced from one Edward Pierce), from whom, on February 21st, 1866, he was divorced by the Superior Court of the State of Rhode Island, she being the innocent party. Said Esther, on March 18th, 1882, married one Macdonald with whom she lived until October 10th, 1897, when he died.

Neither of the appellants had received any provision by way of jointure, nor had either of them entered into a contract with said Lucius D. Brown under the statute of 1877 in respect to their property rights, nor received alimony, nor in any way forfeited a right to dower, if such right exists under the facts stated.

The decedent, Lucius D. Brown, on December 25th, 1867, lawfully married Mary Gray, with whom he lived until his death. He left a will by which he gave his whole estate to his wife, Mary Gray, for life, and upon her death to his brothers and sisters.

Prior to his marriage with Mary Gray, the decedent had not been the owner of any property of value. All his real estate was acquired after March 10th, 1875, and the greater part of it after March 18th, 1882.

All persons interested in the estate of Lucius D. Brown were, by order of court, made parties to these appeals.

*Frank T. Brown* and *Albert B. Crafts*, for the petitioner.

*Solomon Lucas* and *Hadlai A. Hull*, for the respondents.

HAMERSLEY, J. Section 618* of the General Statutes, pro-

---

* Section 618. Every woman married prior to April twentieth, eighteen hundred and seventy-seven, and living with her husband at the time

viding for dower, should be read in connection with § 630,*
providing for distribution, and § 2803, permitting both parties
to a divorce to marry again.　The appellants read § 618 as if
it stood alone, and construe its language without reference to
its history, as if it gave an absolute right to a life estate in
one third of his land not only to a man's widow, but in addi-
tion to each surviving woman who may have been divorced
from him through his fault.　Such a construction leads to
results absurd and impracticable, which the legislature could
not have intended.　This of itself is sufficient to mark the
construction as wrong.　The letter of a statute cannot pre-
vail against the plainly indicated intent of the legislature.
*Bridgeport* v. *Hubbell*, 5 Conn. 237, 243; *Richmondville Mfg.
Co.* v. *Prall*, 9 id. 487, 495; *Rawson* v. *The State*, 19 id. 292,
299.　We think, however, that the letter of the statute and
the intention of the legislature may readily be reconciled.

of his death, or absent by his consent, or by his default, or by accident,
or who has been divorced without alimony, where she is the innocent
party, shall have right of dower, during her life, in one-third part of the
real estate of which her husband died possessed in his own right, unless
a suitable provision for her support was made before the marriage by
way of jointure, etc.

*Section 630.　The distribution of intestate estates shall be as fol-
lows, that is to say: 1. To the wife of the intestate, whose marriage
took place prior to April twentieth, 1877, and who, during the marriage,
did not contract with her husband in manner and form, and for the pur-
poses provided in section 624, there shall be distributed and set out one-
third part of the personal estate of the intestate forever, and if there be
no children of the intestate or any legal representative of them, one-
half of the personal estate forever, and if she shall not have been other-
wise endowed before marriage, one-third part of the real estate to her
during life as provided in sections 618 and 619.　2. To the husband or
wife of the intestate, whose marriage took place on or subsequently to
April twentieth, 1877, or who having been married before that day, did,
during marriage, enter into a contract with each other in manner and
form and for the purposes provided in section 624, and cause the same
to be recorded as in said section is provided, there shall be distributed
or set out such portion or share of the estate of the intestate as such
husband or wife will be entitled to under the provisions of section 623.
3. All the residue of the real and personal estate shall be distributed in
equal proportions, according to its value at the time of distribution
among the children and the legal representatives of any of them who
may be dead, etc.

Did our law, like that of many States, recognize a right of dower as to all lands possessed during coverture, originating in marriage and consummate on its termination, and permit this right to be enforced on the termination of marriage by a divorce, the difficulty presented by the language would be less apparent; but in these respects our law is wholly different.

Section 618, in its essential features, first appears in the Revision of 1672. The language referring to a divorced wife has never acquired a practical construction, nor has its meaning been determined by any utterance of this court. The meaning of the language must, therefore, be that attached to it as used in the Act of 1672. *Hale's Appeal*, 69 Conn. 611, 618.

In order to appreciate the meaning of this Act, it is necessary to remember our peculiar law of divorce, of inheritance and of distribution, at the time the Act was passed.

When the "Jurisdiction of Connecticut" was organized in 1639, the law of the land, as recognized by the settlers, consisted in the orders of the General Court, and, in case of the defect of a law, in the Word of God. Educated as Englishmen and subjects of the British crown, our ancestors were mainly influenced in their laws and customs by the English law; but their government was both unauthorized (in its beginnings) and practically independent. They never formally adopted the common law of England; but one attempt in that direction was made and that was abandoned without action. 4 Col. Rec. 261. As our jurisprudence developed, the courts applied the principles of the common law to the decision of causes, so far as they seemed applicable to our social conditions; *Baldwin* v. *Walker*, 21 Conn. 168, 181; but in many respects, especially in the law of marriage, divorce, land, descent and distribution, there was a wide departure from the English law.

In England the common law, following the canon law, prohibited absolute divorce for any cause arising after a valid marriage. 1 Black.'s Comm. 441; *Foljamb's Case*, 3 Salk. 138. The early reformers were opposed to this law. They believed

the Scriptures authorized a release from the marriage covenant
to the injured party in certain cases. A commission to inquire
into this subject was authorized in the reign of Henry VIII.
and another in the reign of Edward VI. The work of the
latter commission was completed, but the King died before it
received royal confirmation. It was, however, published dur-
ing the reign of Elizabeth, under the title of " *Reformatio
Legum Ecclesiasticarum.*" It provided that in cases of adul-
tery and malicious desertion the injured party might have
liberty to marry again. Pending the work of this commis-
sion, it was decided in the case of the Marquis of Northamp-
ton, by a special tribunal appointed by the King, that by the
Word of God a man divorced for the adultery of his wife
might marry again. Possibly before the accession of Mary
this precedent was followed in other cases. 3 Reeve's Hist.
Eng. Law (ed. 1869), pp. 495, 498, 499.

This view of marriage and divorce was held by the first
settlers of Connecticut. Accepting the Word of God as
law in matters not touched by any special ordinance, their
courts began at once to decree a separation on what they
deemed the scriptural grounds of adultery (citing Matt.
xix. 9) and malicious desertion (citing 1 Cor. vii. 15),
ordering a provision by way of alimony where it seemed
equitable, and granting permission to the injured party to
marry again. 1 Col. Rec. pp. 275, 301, 362, 379; 2 id. pp. 129,
292, 293, 322, 326–328; 3 id. p. 23; 4 id. p. 59; 10 id. p. 168;
14 id. pp. 223, 387. These divorces, though granted by the
General Court which possessed supreme legislative and judi-
cial power, were not legislative but purely judicial. This ap-
pears (among other reasons) from the fact that when this
jurisdiction was first exercised the conception of a legislative
divorce had not developed. The first parliamentary divorce
was in 1669.

All the divorces were based on the scriptural, *i. e.* common-
law, right of the injured party to be released from his con-
jugal tie and to be permitted to marry again. This permis-
sion was special to the injured party; as phrased in one of
the decrees : " In case the said S. T. shall have opportunity

to join herself in marriage with another man, she is left at liberty so to do without offense to the law or this court." 2 Col. Rec. p. 293. In 1677 a statute was passed defining the grounds of divorce and authorizing the Court of Assistants, as well as the General Court, to grant bills of divorce " to the aggrieved party who may than lawfully marry or be married to any other." 2 Col. Rec. p. 328. This law remained unchanged until 1849, when the court was authorized to " declare the petitioner to be single and unmarried; and the parties divorced, may then lawfully marry again." Revision of 1849, p. 274.

When, therefore, the Act of 1672 was passed, a husband divorced for his own fault had not permission to marry again. By the Connecticut law the English law of prohibition was removed as to the innocent party.

Our land law, also, was, from the beginning, different from that of England. The rule of descent was substantially that of personal property; and realty and personalty were subject to the same law of distribution. In 1639 it was ordered that the court should divide intestate estate to wife, children or kindred, as in equity they should see meet. 1 Col. Rec. p. 38. Distributions were made by the magistrates of the General Court; and under their rulings a practice grew up of dividing the land and personal property indifferently, one third to the widow and two thirds to the children, modified at times to meet the equities of particular cases. Sometimes, when the main portion of the personal property was given to the widow, she would receive one third of the land for life. 1 Col. Rec. p. 446. The tenancy by dower was unknown to our early law. The widow's interest in the land, as well as in the personal property of her husband, was through distribution. As our law gave her one third of all her husband's estate, subject to the discretion of the court in distribution, there was no occasion for dower, except to meet the case where a husband, by will, should divert his whole property; and it was mainly to meet this emergency (that in such case " there may be suitable provision made for the maintenance and comfortable support of widows, after the decease of their husbands ") that

the Act of 1672 was passed. It was in effect an amendment to the law of descent and distribution, and provided that every woman upon the death of her husband should have "by way of dower" one third of his land for her natural life, and that "the remainder of the estate shall be disposed of according to the will of the deceased; and where there is no will according to law." See Rev. of 1750, p. 43. The use of the words "by way of dower" may determine to a certain extent the incidents of this life estate; the estate, however, does not arise from the English law of land, but from a statute in aid of the Connecticut law of descent and distribution. This statute practically extends and modifies the widow's right to a share of her deceased husband's estate, realty as well as personalty. In this it differs from the provisions of the New Haven laws of 1656 and the Massachusetts Act of 1641. Both these Colonies adopted the English law of dower, giving to the wife a right of dower in any land of which the husband might be seized during coverture. Connecticut extended and modified the right of a wife to share in all the estate her husband might leave at his death.

The Act was so regarded by other legislation relative to the same subject. When the common law of descent and distribution was first formulated into a statute in 1696, it was ordered that when a man dies intestate "his widow, if any be, shall have, besides the third part of his real estate during her life, a part also of his personal estate," etc. 4 Col. Rec. p. 167. And the statute of descent and distribution of 1699, being substantially the same as the one now in force, provides that the Court of Probate shall distribute the estate as follows: "one third part of the personal estate to the wife of the intestate (if any be) forever, besides her dower or thirds in the housing and land during life, where such wife shall not be otherwise endowed before marriage, and all the residue of the real and personal estate, by equal portions, to and among his children," etc. 4 Col. Rec. p. 307. And in 1736 it was provided that the Court of Probate should assign the dower in case of will as well as of intestacy; and such is the present law. General Statutes, §§ 619, 630. This view

of the origin of the widow's right in the land of her deceased husband is acted upon in *Stewart* v. *Stewart*, 5 Conn. 317, 320.

Such being the existing law of divorce, descent and distribution in 1672, the Act in question was passed as follows: " That every married woman (living with her husband in this Colony or elsewhere absent from him with his consent or through his mere default, or inevitable providence, or in case of divorce where she is the innocent party) that shall not before marriage be estated by way of jointure in some houses, lands, tenements, hereditaments for term of life, or with some other estate in lieu thereof, shall, immediately after the death of her husband, have right and interest by way of dower in and to one third part of the real estate of her deceased husband's lands, etc., to be to her during her natural life." 8 Col. Rec. p. 56.

Reading this language in view of the conditions it was framed to meet, it is certain that this right of dower, like the right to a distributive share of personal property, cannot exist before a husband's death, and affects only the estate left by him; that in no event can more than one third of the real estate be assigned for dower; and that the person entitled to dower is the wife living with the deceased at the time of his death, unless her separation at that time is due to his fault or accident, or to a divorce that leaves her free and the man so far her husband that he has no other conjugal tie.

It is certain that a woman divorced is admitted to dower only because she represents, and no other is, the wife living with her husband or separate through his fault. As was said in *Stilson* v. *Stilson*, 46 Conn. 15, 19, her right to dower is " precisely the same as that of a woman living with her husband at the time of his death." When a woman lives with her husband at his death she possesses the right, and the same right can then belong to no other.

When the Act of 1849 expressly authorized the marriage of a man divorced for his fault, it did not enact a different law for such marriages; it gave to the wife the full rights of a wife, and among them the right to share her husband's estate by way of dower, as well as of distribution, in the same man-

ner as every other wife ; and to that extent it modifies the operation of the statute of dower. The present statute enables a woman divorced for her husband's fault, to be treated as so far his wife that she may share his estate by way of dower, so long as she represents the wife living with him or separated by his fault ; but the Act of 1849 modifies the practical effect of this by enabling the divorced husband to lawfully take a wife, who, living with him at the time of his death, is, by the express terms of the statute, the one entitled to dower. The words " or who has been divorced where she is the innocent party, " still mean the wife separated by his fault from a man who has no other conjugal tie ; if, however, he acquire such tie and leaves a lawful wife surviving, she is the "married woman living with her husband at his death," and the contingency of separation provided for by the qualifying words does not exist.

In *Stilson* v. *Stilson, supra,* the divorced husband had married again, but, as appears, the second wife did not survive him. The court assumed that the divorced wife was entitled to dower. Had there been no second marriage, there could have been no question of her right. Whether the result is the same in the case of a second wife not surviving her husband, is a question that was not discussed ; it was assumed to be the same, the whole contest of the case turning on the effect of a contract between husband and wife before the divorce. If, upon lawful marriage after divorce, the link between the wife and her divorced husband which supports her claim to dower, is finally severed, no troublesome questions will arise, no matter how many times a man is divorced. Otherwise, such questions as have been discussed in this case may arise whenever a man dies leaving more than one divorced widow and no genuine widow. In this case, however, the much married man has left a widow, and under the statute she and no one else is entitled to dower, so that the questions are not material. They are not likely to become practical. Such a case as this has never before been presented to this court, and it is to be hoped it may never arise again ; moreover, the legislation of 1877 has abolished dower as to all marriages entered into after that date.

Upon the appeal of Phebe E. Brown the Superior Court is advised to render judgment affirming the order of the Court of Probate.

Upon the appeal of Esther Macdonald the Superior Court is advised to render judgment affirming the order of the Court of Probate.

In this opinion the other judges concurred.