BURRITT INTERFINANCIAL BANCORPORATION *v.*
BROOKE POINTE ASSOCIATES ET AL.

SUPERIOR COURT        JUDICIAL DISTRICT OF        FILE NO. 98993
                      WATERBURY

Memorandum filed August 6, 1992

*Tyler, Cooper & Alcorn,* for the plaintiff.

*St. John, Scappini, Lombard & Stephens,* for the named defendant et al.

*Zeldes, Needle & Cooper,* for the defendant Richard Barbieri, Sr.

*Gager & Henry,* for the defendant John Corpaci.

No appearance for the defendant Vinal S. Duncan.

BLUE, J. This case presents an important question concerning the extent to which civil defendants' state and federal constitutional rights against self-incrimination protect them against the compulsory disclosure of incriminatory books and papers to a plaintiff.

This is a foreclosure action. The plaintiff, Burritt Interfinancial Bancorporation, obtained a deficiency judgment in the amount of $1,947,279.40 against the defendants on July 15, 1991. The defendants include Richard Barbieri, Sr., and John Corpaci. Barbieri and Corpaci have achieved a great deal of notoriety recently because of their involvement in what might be called the Santopietro affair. See *United States* v. *Santopietro,* United States District Court, District of Connecticut, New Haven, Docket No. 3:91 CR65 (1992). Barbieri and Corpaci have each entered guilty pleas in the United States District Court for the district of Connecticut and have recently been sentenced by that court.

Barbieri entered pleas of guilty to one count of aiding and abetting bank fraud in violation of 18 U.S.C. § 1344, one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, and one count of making a corrupt payment in violation of 18 U.S.C. § 666. As revealed by a written stipulation of relevant conduct filed in the federal district court, the bank fraud

offense involved a fraudulent loan application approved by Barbieri in his capacity as president of the Security Savings and Loan Association. The conspiracy offense involved a large number of corrupt payments that Barbieri, Corpaci and Vinal S. Duncan made using a variety of real estate development partnerships, corporations and other entities. The corrupt payment offense involved a $9000 bribe paid by Barbieri, acting on bahalf of himself, Corpaci and Duncan, to Joseph J. Santopietro, who was then mayor of the city of Waterbury. On June 30, 1992, Barbieri received a sentence of five years.

Corpaci entered pleas of guilty to one count of conspiracy to defraud the United States and one count of making a corrupt payment. The facts underlying the conspiracy count are essentially those described in Barbieri's case. The corrupt payment count involved a $10,000 payment made by a Connecticut corporation called Hitchcock Court Associates, Inc.—formed by Corpaci, Barbieri and Duncan—to influence and reward various public officials of the city of Waterbury. On June 29, 1992, Corpaci received a sentence of three and one-half years.

The federal plea agreements signed by Barbieri and Corpaci grant them immunity from further federal criminal prosecution in the district of Connecticut in connection with what might be called their Santopietro activities. Those agreements do not in any way protect them from prosecution by any other jurisdiction, including prosecution by the state of Connecticut.

The judgment in the present case was rendered on July 15, 1991. On March 5, 1992, the plaintiff filed motions for permission to examine the judgment debtors. In response, on April 2, and 6, respectively, Barbieri and Corpaci filed written motions for protective orders. These motions seek orders protecting Barbieri

and Corpaci from responding to any of the plaintiff's asset disclosure requests until such time as they no longer face any possibility of criminal prosecution.

Barbieri's motion for protective order was heard on April 28, 1992. At the hearing, the plaintiff informed the court that it was claiming only certain document requests.[1] Corpaci was unable to participate in the hearing because of another commitment by his attorney,

---

[1] The plaintiff's document requests are: "The plaintiff hereby requests that the defendant John A. Corpaci provide it with copies of the following documents, or an opportunity to inspect the documents, at least two days before the asset examination. Unless otherwise specified, the period of time covered by each request is from January 1, 1989 until the date of the asset examination.

"1. Any and all statements for any and all accounts, including but not limited to checking, savings, certificates of deposit, and investment retirement accounts, stocks with any financial institution or brokerage house or other entity.

"2. Check registers and canceled checks for all checking accounts.

"3. Copies of, or receipts of, any and all bank checks, money orders, certified checks and similar items.

"4. Any and all deeds, contracts or documents evidencing your interest, present or future, in any real property.

"5. Any and all deeds, contracts or documents evidencing the transfer by you of any property, real or personal, to any person or entity from June 1, 1989 to the present.

"6. Any and all contracts, promissory notes, memoranda, correspondence or other documents evidencing any debt owed to you by any person or entity including but not limited to rent payments, security deposits and judgments.

"7. Any and all contracts or documents evidencing any interest you have, present or future, in any insurance policy or annuity or any interest you may have had from January 1, 1989 until the present.

"8. Any and all documents or contracts evidencing your interest in any business partnership or joint venture.

"9. Any and all documents or contracts evidencing your transfer of any interest in any business, partnership or joint venture since January 1, 1989.

"10. Any document evidencing any interest in any government or corporate bonds or other negotiable or non-negotiable instruments or your transfer of such item since January 1, 1989.

"11. Any document evidencing your possession of any safe deposit box or your transfer of such item since January 1, 1989.

"12. Any document evidencing any interest in any IRA, ERISA, Keogh or other pension or profit sharing plan or your transfer of such interest since January 1, 1989.

but both he and the plaintiff have subsequently submitted letters and briefs stating that the issues presented by his case are the same as those in Barbieri's. All parties have urged the court to decide both cases together, and this request should obviously be granted.

The first issue that must be addressed is the danger of incrimination. Barbieri's and Corpaci's plea agreements insulate them from further prosecution in the United States District Court for the district of Connecticut for the criminal activities in question. Those agreements do not protect them from prosecution by the state of Connecticut, by other states, or by the United States in other districts. The crimes for which Barbieri and Corpaci have been prosecuted in the district of Connecticut are not minor, little-noticed, certain-to-be-overlooked affairs. Rather, this is a cause celebre, the cynosure of extensive media attention, involving the apparent corruption of a number of bankers and municipal officials. In spite of the fact that significant federal sentences have already been imposed, the court does not view the possibility of further prosecution by the state of Connecticut or even other federal officials as so negligible that it can be confidently disregarded,

"13. Any document evidencing any interest you have in any contingent or non-contingent interests in any estate, death benefit plan, life insurance policy, or trust.

"14. Any document evidencing any contingent or unliquidated claim of any nature owed to you including tax refunds, counterclaims of yours, and right of set off claims.

"15. Any document evidencing any interest you have in any license, patent, copyright or other intellectual property or your transfer of such item since January 1, 1989.

"16. Insurance policies, including all homeowners policies.

"17. Financial statements.

"18. Any and all documents evidencing any assets you have or any assets owed to you or any assets you have transferred since January 1, 1989.

"19. All tax returns, state and federal, for the tax years 1987 through 1992.

"20. Any and all documents evidencing any stocks, or your transfer of such stocks since January 1, 1989."

particularly if the corruption in which Barbieri and Corpaci have apparently been involved turns out to be widespread.

It is, of course, for the court to say whether the refusal of Barbieri and Corpaci to disclose the documents in question is justified. As the United States Supreme Court has explained, however, "if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' See Taft, J., in *Ex parte Irvine,* 74 F. 954, 960 (C.C.S.D. Ohio, 1896)." *Hoffman* v. *United States,* 341 U.S. 479, 486–87, 71 S. Ct. 814, 95 L. Ed. 118 (1951).

The functional rule, as McCormick explains, is that "it is sufficient that information sufficiently implicates a person in activity that is formally criminalized, and the courts will not inquire further into such matters as the probability of actual prosecution." 1 C. McCormick, Evidence (4th Ed. 1992). §§ 128, 129, pp. 444–45.

The court's "perception of the peculiarities of the case" is that the possibility of further prosecution is a legitimate one. "In this setting it [is] not *'perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the [production] *cannot possibly* have such tendency' to incriminate. *Temple* v. *Commonwealth,* 75 Va.

892, 898 (1881) . . . ." (Emphasis in original.) *Hoffman* v. *United States,* supra, 488; see *State* v. *Simms,* 170 Conn. 206, 209, 365 A.2d 821, cert. denied, 425 U.S. 954, 96 S. Ct. 1732, 48 L. Ed. 2d 199 (1976).

Given the possibility of further prosecution, the question of whether the documents sought to be produced would, in fact, be incriminatory must be considered at a rather high level of abstraction. There is a theoretical possibility that these documents would not be incriminatory. Given the facts, however, that the crimes for which Barbieri and Corpaci have already been convicted involve their complex financial affairs and that the documents sought here would reveal almost everything imaginable about their financial affairs, this possibility seems negligible. It would not be appropriate, under these circumstances, to order the documents produced under seal for inspection in chambers. Judge Celotto has already ruled, in another case involving Barbieri and Corpaci (and, the court is informed by counsel, these very discovery requests), that the sealing of discovery responses by the court does not provide sufficient protection against self-incrimination because a court has no authority to grant immunity. *Harbor National Bank of Connecticut* v. *Leeward Group,* Superior Court, judicial district of New Haven, Docket No. 307811 (October 8, 1991, 6 C.S.C.R. 955). "A declarant must be granted at least use and derivative use imunity before he can be compelled to give testimony which would tend to incriminate him." Id., 956. This court agrees with Judge Celotto's analysis in *Harbor National Bank of Connecticut,* and declines to have the documents submitted under seal. Under these circumstances, the strong likelihood that these documents would indeed be incriminatory remains unrebutted.

The plaintiff has responded, however, that to ask whether the documents in question would themselves be incriminatory is to ask the wrong question. Draw-

ing on a recent line of United States Supreme Court cases, the plaintiff argues that in the case of a documentary subpoena (as distinct from the compulsion of oral testimony) "the only thing compelled is the act of producing the document." *Fisher* v. *United States,* 425 U.S. 391, 410 n.11, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976). In these cases, according to the plaintiff, the fifth amendment's protection is implicated only if the act of complying with the production demand "testifies to the existence, possession, or authenticity of the things produced." *Baltimore City Department of Social Services* v. *Bouknight,* 493 U.S. 549, 555, 110 S. Ct. 900, 107 L. Ed. 2d 992 (1990). This is a powerful argument, in light of *Bouknight, Fisher,* and *United States* v. *Doe,* 465 U.S. 605, 104 S. Ct. 1237, 79 L. Ed. 2d 552 (1984). *Fisher* seemingly limits the scope of the fifth amendment to "compelled testimonial communications"; *Fisher* v. *United States,* supra, 409; and Justice O'Connor stated in her concurring opinion in *United States* v. *Doe,* supra, 618, that "the Fifth Amendment provides absolutely no protection for the contents of private papers of any kind." Barbieri and Corpaci have relied in their memoranda, however, on their state constitutional rights as well as their fifth amendment rights, and their state constitutional rights adequately protect them against the document production requests here.

The text of the state constitutional guarantee against self-incrimination does not track the text of the fifth amendment. The constitution of Connecticut, article first, § 8 (amended in unrelated ways by the constitution of Connecticut, amendment seventeen) provides: "No person shall be compelled to give evidence against himself . . . ." The fifth amendment, in contrast, provides that no person "shall be compelled in any criminal case to be a witness against himself . . . ." The state constitutional phrase "give evidence," although

obviously broader than the fifth amendment's phrase "be a witness," must not be too literally construed, for that would protect from production a wide variety of nontestimonial items that the framers of the state constitution never intended to protect. *State* v. *Asherman,* 193 Conn. 695, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985), shines a cautionary beacon in this regard. The defendant in *Asherman,* a murder suspect, was compelled to permit the taking of wax impressions and photographs of his teeth. (There was a bite mark on the victim's body.) The Connecticut Supreme Court rejected his contention that the dental impression was protected by the state constitution, likening the impression to other kinds of items—e.g., photographs of the accused, paraffin casts of hands, articles of clothing and fingerprints—previously held to be unprotected. Id., 712. In articulating its reasoning, the court noted that, "[t]he privilege against self-incrimination embodied in article first, § 8 has its genesis in the common law"; id., 711; and that, "[t]he purpose of incorporating the privilege in our state constitution was to place this right as it was known at common law beyond legislative abolition." Id., 712.

The common law that article first, § 8, was intended to preserve for the ages is an ascertainable historical fact. When it is examined, the state constitutional use of the term "evidence" becomes meaningful—broader than the fifth amendment, but at the same time consistent with *Asherman* and the cases on which *Asherman* relies. The relevant common law was succinctly stated in Swift's Digest, published five years after the adoption of the constitution of 1818. "By the common law, no man is bound to testify against himself: nor can he be compelled to produce any written documents which may be evidence against him . . . ." 2 Z. Swift, Digest of the Laws of the State of Connecticut (1823),

p. 160 (hereinafter Digest). Although some care must be taken to interpret this brief passage correctly, the conclusion that follows from it is irresistible. Article first, § 8, uses the phrase "give evidence" rather than "be a witness" because it was intended to protect something more than testimonial communications. That something more had nothing to do with items like dental impressions, clothing, or fingerprints, as *Asherman* correctly points out. The additional protection of article first, § 8, was meant for written documents.

The historical background of the constitution of 1818 confirms this analysis. It is, however, necessary to distinguish between the functional limitations placed on the common law by the separate existence of the equity jurisdiction and what would now be called the constitutional limitations placed on both common law and equity by the principle against self-incrimination.

There were, to begin with, historic restrictions on the powers of the common law courts that had nothing to do with what we would now call constitutional rights. As a current leading English authority summarizes the background: "The Common Law Courts did not have discovery as such, although there were restricted, and very technical methods of obtaining inspections of documents, e.g. by oyer of deeds, etc. to which the other party had referred in his pleadings, or by obtaining an order for inspection founded on a duty or trust to make the documents available. . . . But in cases where these methods were not available, a party to a Common Law action who wished to have discovery filed a bill in equity for this relief only, the action being adjourned meanwhile." 1 The Supreme Court Practice 1988 (J. Jacob ed., 1987) p. 408. Blackstone lamented the common law's "want of a complete discovery," and especially, its "want of a compulsive power for the production of books and papers belonging to the parties." 3 W. Blackstone, Commentaries on the Laws of England (1807) p. 382.

The same limitations on the power of common law courts existed in this country until long after the constitution of 1818 had been adopted. Story, like, Blackstone, noted "the want of a power in the Courts of Common Law to compel the production of deeds, books, writings, and other things, which are in the custody, or power of one of the parties, and are material to the right, title, or defence of the other." 2 J. Story, Commentaries on Equity Jurisprudence (1st Ed. 1836) p. 702. The discovery of papers and documents was not allowed in common law courts in Connecticut until 1836. Public Acts 1836, c. III.

To describe only the state of the common law, however, is misleading, for equitable discovery procedures did exist apart from the common law. In England, for instance: "By the end of the eighteenth century, the courts of Equity (the Court of Chancery and the Court of Exchequer in its equitable jurisdiction) had evolved a method of proof to which the general name 'discovery' was given, and which comprised: (i) discovery of deeds and documents, by which a person could be compelled to produce for inspection deeds or documents relevant to a dispute which were in his possession or power; this procedure was the foundation of discovery in the modern sense . . . [and] (ii) discovery of facts by which a person might be ordered to answer as to the existence of some fact within his knowledge and relevant to a dispute; this form of discovery was the origin of interrogatories." 1 The Supreme Court Practice 1988, supra, p. 408. Early American courts had similar equitable powers. 2 J. Story, supra, p. 702. Swift's Digest, immediately after its discussion of the discovery limitations of common law, states that "equity will compel a defendant to make a discovery of facts in his knowledge, and the production of deeds, writings, or any documents in his custody and power, though they will operate as evidence against him . . . ." 2 Z. Swift, Digest, supra, p. 160.

If *Asherman* is to be taken literally in its statement that article first, § 8, was meant to embody the "common law" of 1818, very little would be discoverable, for almost all discovery powers were then in the equitable jurisdiction. The early distinction between common law and equity was not before the court in *Asherman,* however, and a more reasonable interpretation of *Asherman's* reasoning, if not its literal language, is that the constitution of 1818 was intended to preserve the privilege against self-incrimination as it applied to *both* the common law and equitable jurisdictions at the time. As it will be discussed, however, that privilege protected books and papers as well as testimonial communications.

"The principle that there is a privilege against self-incrimination has been recognised for centuries." *A.T. & T. Istel Ltd.* v. *Tully,* [1992] Q.B. 315, 329 (C.A. 1991). The United States Supreme Court explained one century ago that, "[t]he maxim Nemo tenetur seipsum accusare had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons, which has long obtained in the continental system, and until the expulsion of the Stuarts from the British throne in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, was not uncommon even in England. . . . The change in the English criminal procedure in that particular seems to be founded upon no statute and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular demand. But, however adopted, it has become firmly embedded in English, as well as in American, jurisprudence." *Brown* v. *Walker,* 161 U.S. 591, 596–97, 16 S. Ct. 644, 40 L. Ed. 819 (1896).

"In time this principle, or an analogous principle, was applied in the courts of equity so as to qualify the obligation to give discovery." *A.T. & T. Istel Ltd.* v. *Tully,*

supra, 329. It was embedded "not least in the Chancery Division which was particularly concerned with the discovery of documents in civil proceedings." *Bishopsgate Investment Management Ltd.* v. *Maxwell,* [1992] 2 W.L.R. 991, 1001 (C.A. 1992). Thus, in 1737, Lord Chancellor Hardwicke said: "[T]here is no rule more established in equity, than that a person shall not be obliged to discover what will subject him to a penalty, or any thing in the nature of a penalty. Under the rule, a man is not obliged to accuse himself, is implied, that he is not to discover a disability in himself . . . ." *Smith* v. *Read,* 26 Eng. Rep. 332 (1737).

Similarly, in early nineteenth century America, Joseph Story noted that "it is against the genius of the Common Law to compel a party to accuse himself; and it is against the general principles of Equity to aid in the enforcement of penalties or forfeitures." 2 J. Story, supra, p. 709. As it happens, however, the fullest and most detailed account of the applicable early nineteenth century law comes from the pen of Zephaniah Swift. Writing eight years before the adoption of the constitution of 1818, the late Chief Justice stated: "A writ of subpoena duces tecum may be issued requiring a witness to produce any deed or writing, in his possession that are necessary evidence for the party. . . . With respect to the excuse that will justify a witness in withholding a written document, I apprehend from analogy of principle, it must be the same as will warrant a witness to testify orally. If the writing required to be produced in evidence will criminate the witness, expose him to a penalty, or forefeiture, or subject him to a civil action, he will not be bound to produce it. Nor will he be bound to produce private papers of his own, which constitute a part of his title; for a man is not compellable to produce evidence against himself . . . ." Z. Swift, Digest of the Law of Evidence (1810) pp. 106–107. This language is striking, particularly because

of the last quoted sentence which essentially mirrors the language of article first, § 8.

One final historical consideration remains. To the generation of men who came to maturity in the aftermath of the Revolutionary War, the contemporaneous legal protection of books and papers was not some obscure detail of the law, tucked safely away in dusty tomes. Rather, it was an issue of fundamental importance that had been burned into the consciousness of lawyers and citizens on both sides of the Atlantic by one of the most celebrated cases in legal history. The case was *Entick* v. *Carrington,* 19 T.B. Howell, State Trials 1029 (C.P. 1765). The Earl of Halifax, George III's secretary of state, issued a warrant authorizing a search of the home of John Entick, publisher of an allegedly seditous newspaper called The Monitor. Entick's home was entered, and his books and papers were examined. He subsequently brought an action in trespass in the Court of Common-Pleas. After twice hearing argument, Lord Camden pronounced the judgment of the court in 1765. In upholding an award of damages he reasoned that: "The great end, for which men entered into society, was to secure their property. That right is preserved sacred and incommunicable in all instances, where it has not been taken away or abridged by some public law for the good of the whole. . . . Papers are the owner's goods and chattels; they are his dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection; and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and carried away, the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect. Where is the written law that gives any magistrate such a power? I can safely answer, there is none; and therefore it is too much for us without such authority to pronounce

a practice legal, which would be subversive of all the comforts of society." Id., 1066. This judgment has long been considered "one of the landmarks of English liberty . . . . [E]very American statesman, during our revolutionary and formative period as a nation, was undoubtedly familiar with this monument of English freedom, and considered it as the true and ultimate expression of constitutional law . . . ." *Boyd* v. *United States,* 116 U.S. 616, 626, 6 S. Ct. 524, 29 L. Ed. 746 (1886); see *State* v. *Griswold,* 67 Conn. 290, 306, 34 A. 1046 (1896).

*Entick* v. *Carrington,* supra, cannot be used to prove too much. It has since been held that a seizure of books and papers by law enforcement officers differs from a subpoena directed to the same papers "in a crucial respect—the individual against whom the search is directed is not required to aid in the discovery, production, or authentication of incriminating evidence." *Andresen* v. *Maryland,* 427 U.S. 463, 474, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976). To paraphrase Justice Holmes, however, a party may be privileged from producing the evidence although not from its production. See *Johnson* v. *United States,* 228 U.S. 457, 458, 33 S. Ct. 572, 57 L. Ed. 919 (1913). *Entick* v. *Carrington,* supra, vividly demonstrates that books and papers occupied a special position in the pantheon of liberty when the state constitution was adopted. To require a Connecticut citizen to produce books and records that may incriminate him by their contents is to require him to do something that the state constitution protects him from doing. It compels him "to give evidence against himself." As applied to books and papers, this is a right to that the drafters of the constitution of 1818 recognized as fundamentally important and intended to preserve for the ages.

The court recognizes that this decision will be unwelcome news for the plaintiff, which legitimately wants

to collect a substantial judgment against the defendants who do not appear to be particularly savory individuals. It is a paradox at the heart of our jurisprudence, however, that the more criminal a person's activities appear, the more important that person's constitutional privileges sometimes become. This is such a case. The motions for protective orders are granted.