[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE MOTION TO COMPEL, MOTION FOR SANCTIONS,MOTION FOR PROTECTIVE ORDERS, OBJECTION TO MOTION TO COMPEL
The plaintiffs allege that they were sexually assaulted by the defendant Raymond Pcolka while he was a priest employed by the defendant Bridgeport Roman Catholic Diocesan Corporation (Diocese). During the times that the assaults allegedly occurred the defendant, Bishop Walter Curtis, was the chief officer of the Diocese. The plaintiffs allege that the Diocese and Bishop Curtis are liable for the assaults based on the negligent supervision of Pcolka by those defendants and based on the doctrine of respondeat superior.
The plaintiffs noticed the depositions of Pcolka, Bishop Curtis and Bishop Edward Eagan. After the court issued certain protective orders pursuant to Practice Book § 221[1] and Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), the plaintiffs renoticed Pcolka's deposition. At that deposition, Pcolka asserted privileges to various questions. The plaintiffs have now filed a motion for sanctions and a motion to compel Pcolka to answer those questions, pursuant to Practice Book § 231.[2] Pcolka has moved for a further protective order to preserve his constitutional and testimonial privileges, pursuant to Practice Book §§ 231, 247(c).[3]
 I
The principal area of dispute concerns Pcolka's asserting his privilege against self-incrimination to several questions during the deposition.[4]
"It is an established principle, that a person cannot, in a suit against him, be compelled to produce evidence against himself; and by strong analogy, he ought equally to be protected in his interest, when CT Page 6728 called on to testify for another." Benjamin v. Hathaway, 3 Conn. 528,532 (1821). This principle is embodied in Article first § 8 of the constitution of the state of Connecticut which provides in part: "No person shall be compelled to give evidence against himself . . . ." Also, the Fifth Amendment to the Constitution of the United States provides that no person "shall be compelled . . . to be a witness against himself . . . ." Despite the somewhat different verbiage employed in these laws, there is no substantive difference between them insofar as testimony is sought; State v. Asherman, 193 Conn. 695,712-713, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S.Ct. 1749,84 L.Ed.2d 814 (1985); although our state constitution may afford greater protection with respect to the production of documents. SeeBurritt Interfinancial Bancorporation v. Brooke Pointe Associates,42 Conn. Sup. 445, 453-454, 625 A.2d 851, 7 Conn. L. Rptr. 151 (1992). "This law has also been codified by the adoption of General Statutes §52-199. . . ."[5] Westport National Bank v. Wood,31 Conn. Sup. 266, 267, 328 A.2d 724 (1974); see also General Statutes §51-35(b)."[6]
The privilege "against self-incrimination `not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' Lefkowitz v. Turley, 414 U.S. 70, 77,94 S.Ct. 316 38 L.Ed.2d 274 (1973)." Olin Corporation v. Castells,180 Conn. 49, 53, 428 A.2d 319 (1980). The privilege extends to pretrial civil discovery proceedings, including depositions. Estate of Fisher v.Commissioner of Internal Revenue, 905 F.2d 645, 648-649 (2d Cir. 1990);Bank One of Cleveland, N.A. v. Abbe, 916 F.2d 1067, 1074 (6th Cir. 1990); Maco-Bibb County Hosp. Auth. v. Continental Ins., 673 F. Sup. 1580,1582 (M.D.Ga. 1987); McIntyre's Mini Computer v. Creative SynergyCorp., 115 F.R.D. 528, 529 (D.Mass. 1987); see Olin Corporation v.Casteils, supra, 180 Conn. 53-54; see also Westport National Bank v.Wood, supra, 31 Conn. Sup. 267, construing General Statutes § 52-199. Its availability "`does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.'" Estelle v. Smith, 451 U.S. 454,462, 101 S.Ct. 1866, 1873, 68 L.Ed.2d 359 (1981) (quoting In re Gault,387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967).
"The standard for determining whether a claim of privilege is justified is "`whether the claimant is confronted by substantial and `real' and not merely trifling or imaginary, hazards of incrimination.'" United States v. Apfelbaum, 445 U.S. 115, 128, 100 CT Page 6729 S.Ct. 948, 956, 63 L.Ed.2d 250
(1980) (citations omitted). . . ." UnitedStates v. Rubio-Topete, 999 F.2d 1334, 1338 (2d Cir. 1993). "A court may not deny a witness' invocation of the fifth amendment privilege against compelled self-incrimination unless it is `"`perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have [a] tendency' to incriminate."' (Emphasis in original.) State v. Williams,200 Conn. 310, 319, 511 A.2d 1000 (1986), quoting Hoffman v. UnitedStates, 341 U.S. 479, 488, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); State v.Simms, 170 Conn. 206, 209, 365 A.2d 821, cert. denied, 425 U.S. 954,96 S.Ct. 1732, 48 L.Ed.2d 199 (1976)." In re Keijam T., 226 Conn. 497,503-04, 628 A.2d 562 (1993). Therefore, "before refusing to allow the privilege, the trial court must find that the answers to any questions proposed cannot possibly have a tendency to incriminate." State v.Cecarelli, 32 Conn. App. 811, 819, 631 A.2d 862 (1993). "[T]he right to one's privilege against prosecution that could result from the testimony sought does not depend upon the likelihood of prosecution but upon the possibility of prosecution." State v. Williams, supra, 200 Conn. 319. "`To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.' Hoffman v. United States, supra, [341 U.S.] 486-87; State v.Simms, supra, [170 Conn.] 209. In appraising a fifth amendment claim by a witness, a judge `must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' (Internal quotation marks omitted.) State v. Williams supra, [200 Conn.] 319." In re Keijam T., supra, 226 Conn. 504.
Based on the allegations of the plaintiffs' complaints, it certainly is possible that answering the questions to which he asserted his Fifth Amendment privilege might endanger Pcolka "because injurious disclosure might result. "Notably, the defendant Pcolka has represented, and the plaintiffs have not denied, that at the inception of this litigation the plaintiffs' attorney gave a statement to the news media in which he declared that he would seek Pcolka's criminal prosecution. Ordinarily, in light of such public pronouncements it would be a strange kind of argument for the plaintiffs to maintain, as they now do, that the defendant is not confronted by substantial and real, and not merely trifling or imaginary, hazards of incrimination; United States v.Rubio-Topete, supra, 999 F.2d 1338; and ordinarily, it would be an equivocal type of justice to so hold. "The plaintiff[s] cannot have it both ways." Kelemen v. Rimrock Corporation, 207 Conn. 599, 607, 541 A.2d 865
(1988). CT Page 6730
Now, however, the plaintiffs argue that all applicable statutes of limitation have expired with respect to the acts complained of against Pcolka. "It is generally held that a witness cannot invoke the privilege against self-incrimination where he is either immune from prosecution, or where prosecution is barred by a statute of limitations. See 98 C.J.S.Witnesses § 437 (1957); 23 Am.Jur.2d Depositions Discovery § 38 (1985). `A legal limitation of the time of prosecution is in practical effect an expurgation of the crime; so after the lapse of the time fixed by law the privilege ceases.' 8 Wigmore on Evidence § 2279 (McNaughton rev. 1961). The constitution protects against only real danger of prosecution, not mere speculative possibilities." Leanard v. Williams,100 N.C. App. 512, 397 S.E.2d 321, 323 (1990); see United States v.Aeilts, 855 F. Sup. 1114, 1119 (C.D.Cal. 1994); Siviglia v. Siviglia,138 F.R.D. 452, 453 (E.D.Pa. 1991); Belmonte v. Lawson, 750 F. Sup. 735, 739
(E.D.Va. 1990); Clark v. City of Munster, 115 F.R.D. 609, 616 (N.D.Ill. 1987) (stating that expiration of the statute of limitations is "[o]ne of the factors which must be considered in determining whether a witness has a reasonable fear of prosecution"); Hollowell v. Hollowell,369 S.E.2d 451, 453 (Va.App. 1988); Handley v. Handley, 460 So.2d 162, 165
(Ala.Civ.App. 1983).
The last acts of which the plaintiffs complain allegedly occurred in 1982. Pcolka has not suggested that any other year is operative for purposes of determining whether the statute of limitations has expired. Indeed, he does not dispute that all relevant statutes of limitations have expired in the State of Connecticut. See Conn. Gen. Stat. §54-193a.[7]
However, Pcolka maintains that the statute of limitations has not expired in the State of New Hampshire. "The privilege against self-incrimination traditionally can be invoked where the claim is made that answering the question will subject the individual to criminal prosecution in another state. United States v. Freed, 401 U.S. 601,91 S.Ct. 1112,28 L.Ed.2d 356 (1971); Marchetti v. United States, 390 U.S. 39,88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Malloy v. Hogan, supra, [378 U.S. 1]; 81 Am.Jur.2d Witnesses § 43." State v. Burton,254 S.E.2d 129, 137-138 (W.Va. 1979).
It would unduly lengthen this already lengthy opinion to indulge in a comprehensive analysis of the New Hampshire statutes of limitations with respect to sexual crimes against minors, and it is unnecessary to do so. Suffice it to say that until 1987 the applicable statute of limitations in New Hampshire for a felony was six years; for a misdemeanor, one year. N.H. R.S.A. 625:8I(a), (b), (c) (1986). The acts complained of by the plaintiffs could be construed to be aggravated CT Page 6731 felonious sexual assault in New Hampshire, which was a class A felony until 1987; N.H. R.S.A. 632-A:2 (1986); felonious sexual assault, which was a class B felony in New Hampshire; N.H. R.S.A. 632-A:3 (1986); or sexual assault, which was a misdemeanor in New Hampshire. N.H. R.S.A.632-A:4 (1986) Also, New Hampshire Revised Statutes Annotated 632-A:7
provided: "Except in those cases where the victim was less than 18 years of age, no prosecution may be maintained under this chapter unless the alleged offense was brought to the attention of a law enforcement officer within 6 months after its occurrence."
"Effective January 1, 1987, . . . the legislature extended the statute of limitations by amending RSA 632-A:7 to provide that `[i]n cases where the victim was under the age of 18 when the alleged sexual assault offense occurred, the statute of limitations shall not begin to run until the victim reaches the age of 18.' RSA 632-A:7 I (Supp. 1986) (1986 amendment). Effective April 27, 1990, the legislature repealed RSA625:8 to provide that `where the victim was under 18 years of age when the alleged offense occurred, [prosecutions for offenses under RSA chapter 632-A may be commenced] within 22 years of the victim's eighteenth birthday.' RSA 625:8, III(d) (Supp. 1993) (1990 amendment)."State v. Martin, 138 N.H. 508, 643 A.2d 946, 948 (1994). However, inState v. Hamel, 138 N.H. 392, 643 A.2d 953 (1994), the Supreme Court of the State of New Hampshire, citing an 1852 New Hampshire case and a 1928 Second Circuit case authored by Judge Learned Hand, held that "[a]fter the limitations period has run . . . it is a vested defense of right that cannot be taken away by legislative enactment. See Willard [v.Harvey], 24 N.H. [344] at 354 [4 Fost. 344 (1952)]; Falter v. UnitedStates, 23 F.2d 420, 425-26 (2d Cir.), cert. denied, 277 U.S. 590,48 S.Ct. 528, 72 L.Ed. 1003 (1928)." Id., 643 A.2d 955. The plaintiffs emphasize that the wrongs which Pcolka is alleged to have committed in New Hampshire necessarily were committed prior to the time when he sold his cabin in New Hampshire, in 1976 or 1977, and that the longest applicable statute of limitations, six years, therefore expired in 1982 or 1983, before the New Hampshire legislature extended the statute of limitations. Therefore, under Hamel, claim the plaintiffs, there is no possibility that Pcolka may be prosecuted for the wrongs he allegedly committed in that state.
Notwithstanding the vicissitudes in the New Hampshire statute of limitations with respect to sexual crimes, N.H. R.S.A. 625:8 VI has continuously provided in pertinent part, and at all times relevant to the acts alleged in these actions, that: "The period of limitations does not run: (a) During any time when the accused is continuously absent from the state or has no reasonably ascertained place of abode or work within this state . . . ." Since Pcolka sold his cabin in New Hampshire CT Page 6732 in 1976 or 1977, within six years of the time of certain criminal acts alleged against him, he is "`"confronted by substantial and `real,' and not merely trifling or imaginary, hazards of incrimination."'" UnitedStates v. Rubio-Topete, supra, 999 F.2d 1338. Otherwise stated, it is far from "perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have [a] tendency' to incriminate." (Emphasis IN original; internal quotation marks omitted.) In re Keijam T., supra,226 Conn. 503-04. Therefore, this "trial court [cannot] find that the answers to any questions proposed cannot possibly have a tendency to incriminate." State v. Cecarelli, supra, 32 Conn. App. 819.
That the prosecutorial authorities presently in office in New Hampshire may not intend to prosecute Pcolka is of no moment. See Statev. Williams, supra, 200 Conn. 319 ("[T]he right to one's privilege against prosecution that could result from the testimony sought does not depend upon the likelihood of prosecution but upon the possibility of prosecution."). "The rarity of prosecutions under a particular statute, or a prosecuting attorney's indication in a particular case that he will not prosecute, are not sufficient to defeat a claim of privilege. . . . In United States v. Miranti, 253 F.2d 135, 139 (2d Cir. 1958), for example, the United States Court of Appeals for the Second Circuit stated: `We find no justification for limiting the historic protections of the Fifth Amendment by creating an exception to the general rule which would nullify the privilege whenever it appears that the government would not undertake to prosecute. Such a rule would require the trial court, in each case, to assess the practical possibility that prosecution would result from incriminatory answers. Such an assessment is impossible to make because it depends on the discretion exercised by a . . . [prosecutor] or his successor.'" Choi v. State, 316 Md. 529,560 A.2d 1108, 1112 (1989); see United States v. Jones, 703 F.2d 473, 478
(10th Cir. 1983) ("Once the court determines that the answers requested would tend to incriminate the witness, it should not attempt to speculate whether the witness will in fact be prosecuted"); In reCorrugated Container Anti-Trust Litigation, 620 F.2d 1086, 1091 (5th Cir. 1980), cert. denied, 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827
(1981) ("even a remote risk that the witness will be prosecuted for the criminal activities that his testimony might touch on" is sufficient to sustain a privilege claim); United States v. Johnson, 488 F.2d 1206,1209 n. 2 (1st Cir. 1973) ("Neither the practical unlikelihood of . . . prosecution, nor the Assistant United States Attorney's denial of an intention to charge [the witness], negated [the witness's] privilege."); see also de Antonio v. Solomon, 42 F.R.D. 320, 323 (D.Mass. 1967);Mississippi State Bar v. Attorney L., 511 So.2d 119, 124 (Miss. 1987);10-Dix Bldg. Corp. v. McDannel, 134 Ill. App.3d 664, 89 Ill.Dec. 469, CT Page 6733 475, 480 N.E.2d 1212, 1218 (1985); People v. Guy, 121 Mich. App. 592,329 N.W.2d 435, 444 (1982); Application of Van Lindt, 109 Misc.2d 686,440 N.Y.S.2d 969 (1981); Commonwealth v. Strickler, 481 Pa. 579,393 A.2d 313, 315 (1978); Matter of Grant, 83 Wis.2d 77, 264 N.W.2d 587, 591
(1978); Vail v. Vail, 360 So.2d 985, 989-990 (Ala.Civ.App. 1977), remanded on other grounds, 360 So.2d 992 (Ala. 1978); Note,Self-Incrimination and the Likelihood of Prosecution Test, 72 J.Crim. L. Criminology 671 (1981).[8] Accordingly, Pcolka's invocation of the privilege against self incrimination to each of the questions to which he asserted it is sustained. This court cannot find, with respect to any substantive question to which Pcolka asserted the privilege, that it is "perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken and that the answer[s] cannotpossibly have [a] tendency' to incriminate." (Emphasis in original; citations and internal quotation marks omitted.) In re Keijam T.,
supra, 226 Conn. 503-04; State v. Cecarelli, supra, 32 Conn. App. 819.
 II
Pcolka also seeks a protective order with respect to questions asked of him at his deposition relating to the sexual misconduct of other priests.[9] He claims that "[t]his line of inquiry is totally immaterial to any issue in the case." The court disagrees.
Practice Book § 243 provides for the taking of depositions upon oral examination "subject to the provisions of Sec[tion] 217" of the Practice Book.[10] Section 217 is simply a title section, "Scope of Discovery". The following section, 218, states the standard for the scope of discovery "in general".[11] It provides in relevant part that a party may obtain discovery of information and disclosure of documents "material to the subject matter involved in the pending action, which are not privileged, whether the discovery or disclosure relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, and which are within the knowledge, possession or power of the party or person to whom the discovery is addressed. Discovery shall be permitted if the disclosure sought would be of assistance in the prosecution or defense of the action and if it can be provided by the disclosing party or person with substantially greater facility than it could otherwise be obtained by the party seeking disclosure. It shall not be ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."
Although this jurisdiction has liberal discovery doctrines; TiantiCT Page 6734v. William Raveis Real Estate, Inc., 231 Conn. 690, 701 n. 12,651 A.2d 1286 (1995); "[d]iscovery is confined to facts material to the [subject matter of the] plaintiff's cause of action and does not afford an open invitation to delve into the defendant's affairs." Berger v. Cuomo,230 Conn. 1, 6-7, 582 A.2d 333 (1990); see Heyman Associates No. 1 v.Insurance Co. of Pennsylvania, 231 Conn. 756, 781-782, 653 A.2d 122
(1995). However, "[i]nformation material to the subject matter of a lawsuit certainly includes a broader spectrum of data than that which is material to the precise issues raised in the pleadings"; Lougee v.Grinnell, 216 Conn. 483, 489, 582 A.2d 456 (1990); although "it is not without limits." 4 Moore's Federal Practice ¶ 26.5[1], p. 26-96.[12]
"The key phrase in this definition — [material] to the subject matter involved in the pending action' -has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case." OppenheimerFund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389-2390,57 L.Ed.2d 253 (1978). "`[T]he court should and ordinarily does interpret [`material'] very broadly to mean matter that is relevant to anything that is or may become an issue in the litigation.' 4 J. Moore, Federal Practice ¶ 26.56[1], p. 26-131 n. 34 (2d ed. 1976)." Id., 437 U.S. 351
n. 12. Material has also been defined to mean "important . . . going to the merits. . . ." Black's Law Dictionary (4th Ed.); see also Ballentine's Law Dictionary (1969); McCormick on Evidence (3rd Ed. 1984) § 185, p. 541. The "subject matter" of this lawsuit is the alleged sexual abuse of male and female children by a single priest employed by the Diocese of Bridgeport.[13] The plaintiffs allege that the Diocese and Bishop Curtis are liable for their assaults based on the negligent supervision of Pcolka by those defendants and on the doctrine of respondeat superior. The alleged participation with Pcolka of another individual in the heinous acts alleged in the complaint obviously is material. Whether Pcolka ever saw children in the second floor living apartments where clergy dwelled at St. John's is material since those children may have heard or seen things, including sexual assaults, which bear on the claims in the plaintiffs' complaint. Moreover, the presence of such children in the rectory bears directly on the plaintiffs' claim in the case of See v. Bridgeport Roman Catholic Diocese that the Diocese "failed to provide or enforce rules prohibiting clergy from having children in the bedrooms and private apartments of rectories and premises owned and controlled by it." Discovery is permissible if it may supply a plaintiff with leads to discoverable evidence, an accepted use of discovery. 4 Moore's Federal Practice § 26.56[1]. p. 26-104, citingBaker v. Proctor Gamble Co., 17 F.R.Serv.2d 30b. 352 Case 1 (S.D.N Y 1952). "[I]t is not too strong to say that a request for discovery should be considered relevant if there is any possibility that the information may be relevant to the subject matter of the action." § 8 CT Page 6735 Wright, Miller Marcus, Federal Practice Procedure Civil 2d § 2008, pp. 108-109. However, because the court has found that Pcolka's answers to these questions may tend to incriminate him, his constitutional privilege against incriminating himself precludes the court from granting the plaintiffs' motion to compel answers to these questions.
 III
In their motion to compel, "[t]he plaintiffs request that the [c]ourt order the defendant to answer all questions regarding his medical health medical problems and/or medical conditions from which he suffers; psychological and/or psychiatric testing which he underwent and the reasons therefore; psychiatric care and treatment as well as any psychiatric conditions from which he suffers." The plaintiffs alleg [allege] that during the deposition, "the defendant Pcolka invoked the patient/physician privilege and refused to answer all such questions regarding these topics. The plaintiffs claim that this information is essential to their claims of both intentional conduct on behalf of the defendant Pcolka as well as their claims against the Diocese of Bridgeport and Bishop [Curtis] involving theories of negligence and respondeat superior. The patient/physician privilege," claim the plaintiffs, "can only be invoked by the physician on behalf of the patient. In other words, the physician is prohibited from revealing information regarding a patient's condition either orally or through written records unless the patient authorizes the same. Although the [c]ourt has entered certain orders limiting the plaintiffs' right to obtain medical documents from the defendant's doctors' and/or personnel file, the plaintiffs have an absolute right to obtain such information directly from the defendant Pcolka. No privilege exists which would allow the defendant Pcolka to refuse to answer these questions." Motion to Compel, p. 3. Pcolka objects to this motion and seeks a protective order with respect to questions "regarding `his health medical problems medical conditions from which he suffers', if any, since this information is confidential in nature, not admissible in evidence in proof of any claim of the plaintiffs, not raised as a defense by the defendant to any claims of the plaintiff, and not likely to lead to admissible evidence." Motion by Defendant Raymond Pcolka for Protective Order, pp. 1-2.
Again, while neither the plaintiffs nor the defendant Pcolka have referenced specific questions propounded during the deposition to which Pcolka asserted a privilege, the court has culled certain questions from the deposition transcript and will address the parties' claims within the context of those questions.[14]
CT Page 6736
At common law, "there is no privilege in Connecticut between a physician and patient. Zeiner v. Zeiner, 120 Conn. 161, 167, 179 A. 644
[1935]." State v. Hanna, 150 Conn. 457, 464, 191 A.2d 124 (1963); seeState v. Robinson, 203 Conn. 641, 657, 526 A.2d 1283 (1987); Tait and LaPlante's Handbook of Connecticut Evidence § 12.8.1. In recent years, the common law has been modified by statute. In 1990, the General Assembly created a "sweeping privilege" for all health care providers. Tait and LaPlante, op. cit., § 12.8.1, 1995 Supplement; see Public Act No. 90-177. That legislation has been codified as General Statutes § 52-1460.[15]
Except for Pcolka's alleged hospitalization at the Institute of Living in 1993, all of the questions to which Pcolka asserted a medical privilege appear to relate to matters preceding 1990. Accordingly, for General Statutes § 52-1460 to be applicable, it would have to apply retroactively.
The settled rule in Connecticut is that "[s]tatutes should be construed retroactively only when the mandate of the legislature is imperative. Adamchek v. Board of Education, 174 Conn. 366, 369,387 A.2d 556 (1978), quoting Michaud v. Fitzryk, 148 Conn. 447,449, 171 A.2d 397 (1961); see New Haven v. Public Utilities Commission,165 Conn. 687, 726, 345 A.2d 563 (1974); Little v. Ives,158 Conn. 452, 457, 262 A.2d 174 (1969). Moreover, statutes that effect substantial changes in the law do not apply in pending actions unless it clearly and unequivocally appears that such was the legislative intent; American Masons' Supply Co. v. F.W. Brown Co., 174 Conn. 219,223, 384 A.2d 378 (1978); E.M. Loew's Enterprises, Inc. v. InternationalAlliance, 127 Conn. 415, 418, 17 A.2d 525 (1941); Old Saybrookv. Public Utilities Commission, 100 Conn. 322, 325, 124 A. 33 (1924); and [courts] have consistently expressed [their] reluctance to give such statutes retroactive application. East Village Associates, Inc. v.Monroe, 173 Conn. 328, 332, 377 A.2d 1092 (1977).Sherry H. v. Probate Court, 177 Conn. 93, 100, 411 A.2d 931
(1979)." (Internal quotation marks omitted.) In re Judicial InquiryNo. 85-01, 221 Conn. 625, 632, 605 A.2d 545 (1992).
Public Act No. 90-177 did not provide that it was to apply retroactively. The privilege it conferred was a substantive change in the law and a substantive obligation on health care providers not to disclose certain communications and information. Compare Sherry H. v.Probate Court, 177 Conn. 93, 102, 411 A.2d 931 (1979). Moreover, nothing in the policy of the statute militates in favor of its retroactive application. The purpose of such statutory privileges is to encourage candor between a health care provider and her patient and "to protect the therapeutic relationship." Tait and LaPlante, op. cit., § 12.9.1. To CT Page 6737 cloak in a privilege, after the fact, a communication in which the parties thereto could have had no reasonable expectation of confidentiality at the time because of the then-existing law would make little sense and not subserve the ends of justice. But see 2 McCormick on Evidence (4th Ed. 1984) § 105. The court holds that General Statutes § 52-146o is not retroactive.[16] For the same reasons, 1969 Public Acts 146c,[17] and which confers a privilege on communications (as defined therein) between a psychologist and his patient, is not retroactive.
The only questions posed at the deposition which directly inquire into communications between Pcolka and a health care provider are those questions pertaining to his 1993 hospitalization at the Institute of Living and the following inquiries: "What did Dr. Sires tell you was wrong with you?" "What did Dr. Meshkin do for you?" To the extent that the answers to the latter questions relate to matters preceding October 1, 1961, they are not privileged. To the extent that the answers to these questions relate to matters on and after that date, they are privileged pursuant to 1961 Public Acts No. 529 which, as amended, is now codified as General Statutes § 52-146d.[18] Moreover, pursuant to that therein) between a psychologist and his patient, is not retroactive. The only questions posed at the deposition which directly inquire into communications between Pcolka and a health care provider are those questions pertaining to his 1993 hospitalization at the Institute of Living and the following inquiries: "What did Dr. Sires tell you was wrong with you?" "What did Dr. Meshkin do for you?" To the extent that the answers to the latter questions relate to matters preceding October 1, 1961, they are not privileged. To the extent that the answers to these questions relate to matters on and after that date, they are privileged pursuant to 1961 Public Acts No. 529 which, as amended, is now codified as General Statutes § 52-146d.[18] Moreover, pursuant to that statute, Pcolka properly asserted the privilege with respect to the following questions: "When you left the Institute of the Living, why did you leave it?" "Why did you leave the Institute of the Living?" "Did you leave voluntarily or involuntarily?" "Why did you enter the Institute of the Living?" "Now, were you ever, just answer yes or no, ever shown any psychiatric records regarding your care and treatment? By anyone?" "What was the reason you were up there [at the Institute of Living] at that time?"
Pcolka's motion for a broad protective order based on the patient/physician privilege is denied. The plaintiffs' motion to compel Pcolka to answer "all questions" relating to medical, psychological, or psychiatric matters is denied for two reasons. Firstly, it is evident that even if the answers to many of those questions were not protected by a physician-patient privilege, they are protected by the Fifth CT Page 6738 Amendment privilege against self-incrimination, discussed supra. The plaintiffs themselves claim that Pcolka's "past mental health is germane to issues involving allegations of sexual abuse." As discussed supra, the privilege against self incrimination extends not only to "answers that would in themselves support a conviction under a . . . criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the [witness]." Hoffman v. UnitedStates, supra, 341 U.S. 486. "To sustain the privilege, it need only be evident from the implications of the question, and the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Id., 341 U.S. 486-87. Secondly, the plaintiffs' claim that "[t]he patient/physician privilege can only be invoked by the physician on behalf of the patient" and that "[n]o privilege exists which would allow the defendant Pcolka to refuse to answer these questions" is wrong. General Statutes § 52-146d(2) defines "communications and records" to include "all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatrist . . . ." General Statutes § 52-146e(a) provides that such communications and records "shall be confidential. . . ." "Confidential communications" are defined as "[c]ommunications made in confidence; communications made to such persons that the law regards them as privileged beyond forcing a disclosure thereof." Ballentine's Law Dictionary (1969), p. 244.
 IV
In their motion to compel, "[t]he plaintiffs request that the [c]ourt preclude the defendant Pcolka's counsel, Frank Murphy[,] from instructing the deponent not to answer questions. . . . The plaintiffs maintain that the information to which Mr. Murphy instructed the deponent not to answer was not information protected by either the attorney-client pravilege or information protected by an individual's right against self-incrimination." Pcolka objects, claiming that "[a] review of the transcript and the particular questions will show that appropriate privilege or other objecti[on]s were raised in a timely and appropriate manner by the witness and by counsel. As a result, there is no basis for a preclusion order."
The defendant is correct. A careful review of the transcript reveals that Attorney Murphy confined virtually all of his remarks to the deponent's assertion of various privileges, to objecting to questions previously asked, and to objecting to the form of certain questions. One confrontation arose when the plaintiff's attorney showed Pcolka a signature on a document and asked him if the signature was his, CT Page 6739 without permitting him to see the rest of the document. Attorney Murphy instructed Pcolka to look at the entire document before he answered. In general, absent a claim of privilege, instructions by an attorney to his client not to answer a question at a deposition is improper. GouldInvestors, L.P. v. General Ins. Co. of Trieste Venice,133 F.R.D. 103,104 (S.D.N.Y. 1990).[19] This, however, was a deposition which was contentious even before it began. After the defendants had sought and had been granted by the court a protective order pursuant to Practice Book § 221, limiting the persons entitled to be present at the deposition and limiting the dissemination of information and documents at the deposition, Pcolka was met as he entered the office of the plaintiffs' attorney with representatives of the news media. After having previously declared that he would seek Pcolka's criminal prosecution, the plaintiffs' attorney proceeded to pose innumerable questions to Pcolka at the deposition which were clearly inculpatory and then claimed that Pcolka's assertion of his privilege against self-incrimination was without a reasonable basis. Under the circumstances, Attorney Murphy comported himself professionally. Neither sanctions nor any other order against him is appropriate.
 V
During the deposition, the plaintiffs' attorney asked Pcolka whether he ever "expressed any problems regarding the vow of chastity" to his "confessor" while he was in the seminary. Pcolka refused to answer based on "confidentiality between priest and confessor."
The assertion here of the 'privilege as to communications between a priest and a "penitent" arises in an atypical manner. Usually, the claim has arisen in the United States when the clergy member is called to testify. See cases collected in Annotation, "Matters to which the Privilege Covering Communications to Clergymen or Spiritual Adviser Extends," 22 A.L.R.2d 1152, as supplemented. In such a circumstance, General Statutes § 52-146b prohibits a member of the clergy from disclosing confidential communications made to him unless the person making the communication waives the privilege.[20] Here, however, the communication is sought from the supposed "penitent", or the person seeking absolution or spiritual advice. The relative dearth of case law involving an attempt to invade the confidential relationship through the penitent himself may be ascribed to the fact that he would ordinarily be fable to assert the settled constitutional privilege against self-incrimination, discussed supra. Here, however, for whatever reasons, Pcolka has relied exclusively on a claimed privilege as to confidential communications between "priest and penitent" The court, of course, must take the case, and the issue, as it finds it. CT Page 6740
General Statutes § 52-146b is silent as to any privilege insulating the penitent from testifying as to what he or she told the clergy member. The legislative history to the statute assumes that such a privilege did or should exist. 12 H.R. Proc., Pt. 7, 1967 Sess., pp. 7-8; 12 Senate Proc., Pt. 5, 1967 Sess., p. 30.[21] However, "[t]he statutory language in question is clear and . . . admits of no ambiguities. We cannot 'search out some intent which we may believe the legislature actually had and give effect to it, . . . we are confined to the intention which is expressed in the words it has used.' . . . ."United Aircraft Corporation v. Fusari, 163 Conn. 401, 410-11,311 A.2d 65 (1972). "The court may not supply a statutory failure to mention the unanticipated situation in express terms merely because the court feels good reason so exists; the remedy in such a situation lies with the general Assembly, not the court." Id., 414. The only other source of such a privilege, in the absence of a statute conferring one, is the common law. Moore v. McNamara, 201 Conn. 16, 24, 513 A.2d 660 (1986).
Although "[i]t is perhaps open to argument whether a privilege for confessions to priests was recognized in common law courts during the period before the Restoration[,] . . . since the Restoration, and for more than two centuries of English practice, the almost unanimous expression of judicial opinion (including at least two decisive rulings) has denied the existence of a privilege." 8 Wigmore on Evidence (McNaughton rev. 1961) § 2394.
There is no evidence as to whether Connecticut followed the English common law rule, or, rather, the absence of such a rule. The only case which has been located in which a witness was questioned as to what she told her clergyman is State v. Jones, 205 Conn. 723, 736-740,535 A.2d 808 (1988). In that case the witness did not object to the question, the defendant objected "only upon the ground of relevance" at trial; id., 736; and even on appeal the issue of privilege never was raised.[22]
In the absence of any case law either way, this court cannot assume that the common law of the State of Connecticut, either now or at the time of its separation from England, comported with that of the mother country in a matter touching upon a settled religious practice and implicating the issue of religious toleration. See 8 Wigmore, op. cit., § 2396, p. 878. It must be recalled that our Connecticut "ancestors never formally adopted the common law of England; one attempt in that direction was made and that was abandoned without action. 4 Col.Rec. 261."Brown's Appeal, 72 Conn. 148, 151, 44 A. 22 (1899) (observing that in many respects, especially in the law of marriage, divorce, land, descent and distribution, there was a wide departure from the English CT Page 6741 law."). "During the greater part of the colonial era, the common law of England was not deemed to form a part of the jurisprudence of Connecticut, except so far as any part of it might have been accepted and introduced by her own authority. Stat., Ed. 1769, 1; 1 Swift's System, 44." Graham v. Walker, 78 Conn. 130, 133, 61 A. 98 (1905). The prevailing view in recent years, as it was nearly 180 years ago, is that "[w]e have, unquestionably, a common law of our own. Its basis is the common law of England; but the superstructure has been modified, with laudable caution, to suit our peculiar circumstances." Preface, 1 Connecticut Reports (1814-1816), p. xxvii (1817), by Thomas Day[23]; accord, Dacey v. Connecticut Bar Assn., 184 Conn. 21, 25-26, 441 A.2d 49
(1981). Those circumstances arise from the reality that "[t]he political and legal institutions of Connecticut have, from the first, differed in essential particulars from those of England." Graham v. Walker, supra,78 Conn. 133.
In the absence of legislative action, courts have the common law power to declare what the common law is Bartholomew v. Schweizer,217 Conn. 671, 679, 587 A.2d 1014 (1991); Nelson v. Steffens, 170 Conn. 356,366-367, 365 A.2d 1174 (1976) (Bogdanski, J., dissenting), majority opinion overruled, Ely v. Murphy, 207 Conn. 88, 540 A.2d 54 (1988). In undertaking this endeavor, a court must be mindful that its delicate task is to make a principled declaration of the common law as it now is, not as it might have been had it been declared at the birth of this State more than two centuries ago. This is so because the very definition of common law is "`the prevailing sense of the more enlightened members of a particular community, expressed through the instrumentality of the courts, as to those rules of conduct which should be definitely affirmed and given effect under the sanction of organized society, in view of the particular circumstances of the time, but with due regard to the necessity that the law should be reasonably certain and hence that its principles have permanency and its development be by an orderly process. Such a definition necessarily implies that the common law must change as circumstances change.'" (Emphasis added.)Dacey v. Connecticut Bar Assn., supra, 184 Conn. 25-26, quoting State v.Muolo, 118 Conn. 373, 378, 172 A. 875 (1934). "The common law. . . `must be rational and compatible with present society if it is to be respected and upheld.' (Citations omitted.) Roth v. Bell, 24 Wash. App. 92,100, 600 P.2d 602 (1979). (Emphasis added.)" Gentry v. Norwalk,196 Conn. 596, 605, 494 A.2d 1206 (1985); cf. Griffin v. Fancher,127 Conn. 686, 688, 20 A.2d 95 (1941) ("Our common law is constantly in process of gradual but steady evolution."); Swentusky v. PrudentialIns. Co., 116 Conn. 526, 531, 165 A. 686 (1933) (The common law "can never be static, but it must be everlastingly developing to meet the changing needs of a changing civilization."). CT Page 6742
Two approaches have been proposed to determine whether the so-called "priest-penitent" privilege should be accorded common law recognition. One approach, espoused by Jeremy Bentham and more recently by Professor Wigmore, is the "utilitarian" approach. The other approach simply declares "the inherent offensiveness of the secular power attempting to coerce an act violative of religious conscience" and forcing its way into the confessional. 1 McCormick on Evidence (4th Ed.) § 76.2. Both approaches converge at the same point: confidential communications between clergy and penitent should not be intruded upon by the courts. "Even by Bentham, the greatest opponent of privileges, this privilege has . . . been conceded to warrant recognition" 8 Wigmore on Evidence (McNaughton rev. 1961) § 2396.
Wigmore opined that there were "four fundamental conditions . . . necessary to the establishment of a privilege against disclosure of communications. . . ." 8 Wigmore, op. cit., § 2285. While these conditions have been criticized because they are "sometimes highly conjectural and defy scientific validation"; Louisell, "Confidentiality, Conformity and Confusion: Privileges in Federal Courts today," 31 Tul. L. Rev. 101, 111 (1956); they are objective criteria which have been cited with approval by several jurisdictions; 8 Wigmore, op. cit., § 2285 n. 2. The court will examine and apply those criteria to Pcolka's claim.
"(1) Does the communication originate in a confidence of secrecy?" 8 Wigmore, op. cit. §§ 2285, 2396, p. 878. It is essential to understand that in the Roman Catholic Church, "[c]onfession of all grave sins which have not yet been directly forgiven in the sacrament is required by the very nature of the sacrament, and is therefore divine law. This obligation to confess extends to grave sins, as far as the penitent is conscious, after serious examination of conscience, of being guilty (even subjectively) of them, but it extends only to them. And then the obligation extends to all such sins even secret and interior ones, according to their actual species . . ., and their number . . . ." Rahner, Encyclopedia of Theology, p. 1190 (1975). For centuries, Church law has imposed the strict obligation of making a valid confession each year if one is conscious of serious sin. Ibid.; 7 Encyclopedia Americanna (1994), p. 534. Protestantism has practiced common confession the entire congregation, individual confession in the presence of the whole congregation, and a private confession to the minister Angeles, Dictionary of Christian theology (Harper Row 1985), pp. 56-57. "The orthodox tradition developed the practice of the auricular (`to the ear') confession to a priest as a surrogate of God." 12 Encyclopedia of Religion, p. 341. When given in confidence, and always in the Roman CT Page 6743 Catholic Church, the confession is protected by the seal of confession. Rahner, Encyclopedia of Theology, op. cit. In the Catholic Church, "[c]onfessions usually are heard in a small enclosed compartment, called a confessional, in churches or oratories. In appearance the confessional resembles a sentry box. The priest sits inside; the penitent kneels outside and communicates with the priest through a finely perforated grating or a lattice of closely spaced crossing bars. Some confessionals have three compartments: the center one serving the priest and the flanking ones accommodating the penitents. The priest establishes communication with the penitent by moving a slide that covers the small grating that is the wall between him and the penitent." 7 Encyclopedia Americanna (1994), p. 534. Thus, in the Roman Catholic Church, dogmatically and physically, the confessional communication originates in a confidence of secrecy.
"(2) Is confidentiality of communication essential to the relation?" 8 Wigmore, op. cit §§ 2285, 2396 p. 878. "In other words would penitential confessions, under such a system as the above, continue robe made if they were liable to be demanded for disclosure in a court of justice when needed?" 8 Wigmore, op. cit., § 2396, p. 878. It is true that empirical data is lacking on this issue, but that is so because "in very few instances was a clergyman required to testify as to confidences communicated to him by a penitent"; Note, "Testimonial Privilege and Competency in Indiana, "27 Ind. L.J. 256, 267 (1952); and because the penitent enjoys an additional, distinct privilege against self-incrimination. However, the court may take judicial notice "of the motives which influence and control human action . . . ." Howe v.Raymond, 74 Conn. 68, 72, 49 A. 854 (1901). As Wigmore acknowledges, "[i]n so far as such confessions concern crimes and wrongs, they might certainly, in some indefinite but substantial measure, be discontinued, and the penitential relation be to that extent annulled." 8 Wigmore, op. cit., § 2396, p. 878. Common sense compels the conclusion that confidentiality of communication is essential to the continuance of the institution of confession.
"(3) Does the penitential relation deserve recognition and countenance? In a state where toleration of religions exists by law," writes Wigmore, "and where a substantial part of the community professes a religion practicing a confessional system, this question must be answered in the affirmative. Historically, the failure to recognize the privilege during three centuries in England has probably been due to a reluctance to concede this affirmative answer. The disabilities of adherents of the Papal Church in England and Ireland — the only church actually enforcing a confessional system — also involved a disfavor to that system." 8 Wigmore, op. cit., § 2396, p. 878. This is "demonstrated CT Page 6744 by Oliver Cromwell's directive regarding religious liberty to the Catholics in Ireland: `"As to freedom of conscience, I meddle with no man's conscience; but if you mean by that, liberty to celebrate the Mass, I would have you understand that in no place where the power of the Parliament of England prevails shall that be permitted."' Quoted in S. Hook, Paradoxes of Freedom 23 (1962). See P. Kurland, Religion and the Law 22 (1962)." McDaniel v. Paty, 435 U.S. 618, 642, 98 S.Ct. 1322,55 L.Ed.2d 593 (1978).
In Connecticut, the "superstructure" of our common law must be informed by statutory enactments since our political departure from England. "The rules pertaining to the admissibility of evidence in Connecticut are subject to the exercise of both judicial and legislative authority. State v. James, 211 Conn. 555, 560, 560 A.2d 426 (1989); C. Tait J. LaPlante, Connecticut Evidence (2d Ed. 1993 Sup.) 1.1.2. `Plainly, every statute has some boundaries, and the question then arises whether, and when, it is appropriate to apply the statute, as a matter of common law, beyond its designated boundaries.' E. Peters, `Common Law Judging in a Statutory World: An Address,' 43 U. Pitt. L. Rev. 995, 1005 (1982). In other contexts, `we have previously used statutes as a useful source of policy for common law adjudication, particularly if there was a close relationship between the statutory and common law subject matters.' Fahy v. Fahy, 227 Conn. 505, 514, 630 A.2d 1328
(1993); accord New England Savings Bank v. Lopez, 227 Conn. 270,281, 630 A.2d 1010 (1993); Canton Motorcar Works, Inc. v. DiMartino,6 Conn. App. 447, 453, 505 A.2d 1255, cert. denied, 200 Conn. 802,509 A.2d 516 (1986)." State v. Kulmac, 230 Conn. 43, 52-53, 644 A.2d 887
(1994). As discussed supra, the General Assembly already has recognized and countenanced the penitential relation, albeit only by protecting communications therein from forced disclosure from the clergy. Additionally, here, unlike England, we enjoy written constitutions. Article First § 3 of the Constitution of the State of Connecticut has, since 1818, provided: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state; provided, that the right hereby declared and established, shall not be so construed as to excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the state." The First Amendment to the Constitution of the United States enjoins as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." That Amendment was held applicable to the states over fifty years ago. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213
(1940). While these constitutional provisions are not directly dispositive of the issue before the court, which is not claimed to be of constitutional dimension, neither can judges in divining the common law CT Page 6745 be blind to constitutional mandates which politically and otherwise continue to define us as a people. "The Free Exercise Clause commits government itself to religious tolerance"; Church of Lukumi Babalu Ayev. City of Hialeah, 508 U.S. 113 S.Ct. 2217, 2234,124 L.Ed.2d 449
(1993); but it mandates even more. "[I]t affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." Lynch v. Donnelly, 465 U.S. 668, 673 (1984). Conversely our "national attitude toward religious tolerance . . . has operated affirmatively to help guarantee the free exercise of all forms of religious belief." Walz v. Tax Commission, 397 U.S. 664, 678 (1970). "This does not mean that the right to participate in religious exercises is absolute, or that the State may never prohibit or regulate religious practices. [The United States Supreme Court has] recognized that even when the action is in accord with one's religious convictions, [it] is not totally free from legislative restrictions. . . . the conduct or actions so regulated [, however,] have invaribly posed some substantial threat to public safety., peace or order." (Internal quotations marks omitted.) McDaniel v. Paty, supra, 435 U.S. 642. It does mean that in Connecticut, which for decades has enjoyed a large population of adherents to the Roman Catholic faith, "the penitential relation deserve[s] recognition and countenance", Wigmore's third condition for the establishment of a privilege against disclosure of communications.[24]
"(4) Would the injury to the penitential relation by compulsory disclosure be greater than the benefit to justice?" Apparently, concedes Wigmore, "it would. The injury is plain; it has been forcibly set forth by Bentham." 8 Wigmore, op cit., § 2396, p. 878. In his 1827 Treatise, the latter wrote that "with any idea of toleration, a coercion of this nature is altogether inconsistent and incompatible.[,] in the character of penitents, the people would be pressed with the whole weight of the penal branch of the law; inhibited from the exercise of this essential and indispensable article of their religion . . . [to the priests, it] would be an order to violate what by them is numbered amongst the most sacred of religious duties . . . . The advantage gained by the coercion — gained in the shape of assistance to justice — would be casual, and even rare; the mischief produced by it, constant and all extensive. Without reckoning the instances in which it happened to the apprehension to be realized, the alarm itself, intense and all-comprehensive as it would be, would be a most extensive as well as afflictive grievance . . . . [T]his institution is an essential feature of the catholic religion, and . . . the catholic religion is not to be suppressed by force. . . ." Bentham, 4 Rationale of Judicial Evidence (1st ed. 1827), pp. 588-90, quoted in 8 Wigmore, op. cit., § 2396; see also Note, "Testimonial Privilege and Competency in Indiana," 27 Ind. L. Rev. 256, 267 (1952). "On the whole, then," concludes Wigmore, "this privilege has adequate CT Page 6746 grounds for recognition." 8 Wigmore, op. cit.
As mentioned supra, not all authorities concur that recognition of the privilege is based on utilitarian grounds "A firmer ground" says McCormick, "appears available in the inherent offensiveness of the secular power attempting to coerce an act violative of religious conscience." 1 McCormick on Evidence (4th Ed.) § 76.2; accord, 2 Mueller Kirkpatrick, Federal Evidence (2d Ed.) § 211. Whatever the basis, since the early nineteenth century, courts have manifested a reluctance to compel the disclosure of confidential communications to the clergy.In re Swenson, 183 Minn. 602, 237 N.W. 589, 590 (1931); People v.Phillips, N.Y.Ct. Gen. Sess. (1813), unofficially reported in 1 W.L.J. 109 (1843) and Note, "Privileged Communications to Clergymen," 1 Cath. Law. 199 (1955). More than a century ago, the United States Supreme Court acknowledged the existence of the privilege in dictum. Totten v.United States, 92 U.S. 105, 107, 23 L.Ed. 605 (1876) ("suits cannot be maintained which would require of the confidences of the confessional . . . ."). "The privilege protecting confidential communications between members of the clergy and communicants who are seeking spiritual advice or comfort is recognized as a matter of federal common law under Fed.R.Ev. 501"[25]; 2 Mueller Kirkpatrick, op. cit. § 211; and was so recognized in case law even prior to the enactment of the Federal Rules of Evidence. See Mullen v. United States, 263 F.2d 275 (D.C. Cir. 1958). Moreover, every state has now enacted a statute in which the privilege has been sanctioned. See statutes collected in 8 Wigmore, op. cit., § 2395 n. 1; see also 13A Uniform Laws Annotated, Uniform Rules of Evidence § 505(b) ("A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual adviser.").
It is true that our statute, General Statutes § 52-146b, does not protect a person from having to disclose communications made by him to a clergyman or to him by a clergyman. And it is also true that unless a statute is constitutionally flawed, a court may not articulate and apply a common law rule which is in conflict with a statute. Burns v. Gold,172 Conn. 210, 222, 374 A.2d 203 (1977). This court is satisfied that the common law rule declared here comports with and is not in conflict with the statute. To paraphrase what our supreme court has said of the attorney-client privilege, the "priest-penitent" privilege being for the protection of the individual's religious freedom to consult in confidence with his spiritual adviser, the privilege "would obviously be defeated if the disclosure of the confidences, though not compellable from the [clergy], was still obtainable from the [penitent]." Rienzo v.Santangelo, 160 Conn. 391, 395, 279 A.2d 565 (1971). CT Page 6747
For the foregoing reasons, this court holds, as a matter of common law, that confidential communications made by or to a member of the clergy in his or her religious capacity are privileged from disclosure whether that disclosure is sought from the member of the clergy from whom solace, counsel or spiritual guidance is sought or from the person seeking the religious solace, counsel or guidance. While there is, as yet, no evidence that the defendant committed the acts alleged against him, still, it is not inappropriate to recall Justice Felix Frankfurter's observation that "[i]t is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." United States v.Rabinowitz, 339 U.S. 56, 69, 70 S.Ct. 430, 94 L.Ed. 653
(1950) (Frankfurter, J., dissenting), quoted in State v. Paradise,189 Conn. 346, 353, 456 A.2d 305 (1983); see Scott v. Hammock, supra,133 F.R.D. 619 (disclosure of confidential communications by person sued for [engaging in various forms of abuse of adopted daughter, held, barred). Pcolka need not disclose the information that he confided to his confessor in the seminary.
 VI
Pcolka has moved for a protective order so that he need not disclose his present address. Conceding that "[o]rdinarily, this would not be the proper subject of either a protective order or a claim of privilege," Pcolka nonetheless claims that "in the context of this case, some latitude must be granted to the defendant Pcolka in the interests of justice." Pcolka advances three reasons in support of his motion.
First, Pcolka claims that at the time of his deposition, there was outstanding a plaintiffs' interrogatory requesting this information to which he had objected and which the plaintiffs had not pursued. The short answer is that the rules for discovery by interrogatory and the rules for discovery by deposition are different. In a deposition, [e]vidence objected to shall be taken subject to the objections"; Practice Book § 247(b); unless the court limits the scope of the deposition on motion "and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party. . . ." Practice Book § 247(c); see also Practice Book § 221.
Second, Pcolka states that "[i]n light of the exceptional pretrial publicity in this case, there is no reason to expose the persons who are residing at the same location as the defendant Pcolka to harassment and annoyance. This [c]ourt, in the decision dated December 8, 1994, expressed concern about pretrial publicity and the ability of the CT Page 6748 defendant to obtain a fair trial. Notwithstanding th[at] admonition. . ., when . . . Pcolka appeared for his deposition . . . he was met by newspaper reporters and cameramen." Pcolka is correct that "there is no reason to expose the persons who are residing at the same location [him] . . . to harassment and annoyance." The plaintiffs' attorney's notifying the press of the date and time of Pcolka's deposition, however, was not violative of the express terms of the court's December 1994 protective order. At that time, the court ordered, pursuant to Seattle Times Co. v.Rhinehart, supra, 467 U.S. 32, that there be no dissemination of information obtained through Pcolka's deposition, except to persons stated in that order. The court cannot assume that the plaintiffs will violate that order. Cf. Sierra Club v. Mason, 365 F. Sup. 47, 50 (D.Conn. 1973) (Newman, J.); Moore v. Serafin, 163 Conn. 1, 11, 301 A.2d 238
(1972). Should such a violation occur, the court has ample authority to deal with it appropriately. See, e.g., Practice Book 351.[26]
The third reason advanced by Pcolka for not divulging his address is that "he has fully responded to all communications sent to him through his attorney, and his attorney has accepted service of process, including service of process for two new cases on February 1, 1995 with the permission of . . . Pcolka. At this juncture, there is no need for this information to be released to the plaintiffs, and thereby become public information, since we know that plaintiffs' counsel will publicize everything about this case." In view of what the court already has stated, that Pcolka's attorney has accepted service of process for him is not grounds for Pcolka's not divulging his address. This portion of Pcolka's motion for a protective order is denied. 4 Moore's Federal Practice ¶ 26.57[1]; 23 Am.Jur.2d, Depositions and Discovery, §§ 34, 35. However, in the interests of justice, the court will amend the terms of its December 1994 protective order to provide that information as to Pcolka's address shall not be disseminated until further order of thecourt.
 VII
Pcolka also seeks a protective order precluding the plaintiffs from inquiring where he went following his release from the Institute of Living. "This release," argues Pcolka, "was in March 1993, some two months after the suits were instituted by some of the plaintiffs. Since the plaintiffs allege activities which they claim occurred between 1967 and 1982, it is difficult to understand how this information is discoverable under any circumstances."
While this argument has facial appeal, it is not consonant with the applicable standard for pretrial discovery, especially discovery by deposition, discussed supra: Discovery is permissible if it may supply CT Page 6749 a plaintiff with leads to discoverable evidence, an accepted use of discovery. 4 Moore's Federal Practice ¶ 26.5611]. p. 26-104. Pcolka's motion for a protective order with respect to where he went following his release from the Institute of Living is denied.
 VIII
Pcolka seeks a protective order with respect to certain other questions asked during the deposition. As to questions of whether Pcolka took minors to his cabin in New Hampshire and whether he allowed children in his rectory bedrooms, Pcolka's assertion of his privilege against self-incrimination is sustained in accordance with the discussion of that privilege, supra.
Pcolka seeks a protective order based on his privilege against self-incrimination with respect to the question as to whether he ever spoke with the Bishop regarding the topic of sexual abuse of children. Pcolka's assertion of his privilege to this question has been sustained in part I of this opinion. "To sustain the privilege, it need only be evident from the implications of the question, and the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Hoffman v. United States, supra, 341 U.S. 486-87. "Injurious disclosure" is not confined to answers that would support a conviction but includes any statements "which would furnish a link in the chain of evidence needed to prosecute." Id., 486.
Finally, Pcolka seeks a protective order with respect to why he took off a year when attending St. John's Seminary. He argues that "[t]his event occurred prior to the time he became a priest and predated the first of the plaintiff's claims by many years. Since it is not related to any issue in the case, nor likely to lead to discoverable evidence, the defendant's motion for protective order should be granted in this regard." The court agrees. Discovery "is not without limits." 4 Moore's Federal Practice ¶ 26.5[1], p. 26-96. At some point in the remote past, materiality ceases. This question is beyond that point.
 IX
The plaintiffs' motion to compel seeks an order requiring Pcolka to answer questions asked of him regarding what was said in a meeting in which he, his lawyer, a representative of the Diocese, and the Diocese's lawyer were present. Pcolka claims that communications made in that meeting are protected by the attorney-client privilege. The court disagrees. CT Page 6750
"It is obvious that professional assistance would be of little or no avail to the client, unless his legal adviser were put in possession all the facts relating to the subject matter of inquiry or litigation, which, in the indulgence of the fullest confidence, the client could communicate. And it is equally obvious that there would be an end to all confidence between the client and attorney, if the latter was at liberty or compellable to disclose the facts of which he had thus obtained possession; and hence it has become a settled rule of evidence, that the confidential attorney, solicitor or counselor can never be called as a witness to disclose papers committed or communications made to him in that capacity, unless the client himself consents to such disclosure." Goddard v. Gardner, 28 Conn. 172, 174 (1859). "`Communications between client and attorney are privileged when made in confidence for the purpose of seeking legal advice. Doyle v. Reeves,112 Conn. 521, 523, 152 A. 882 (1931); Tait LaPlante, Handbook of Connecticut Evidence (1976) § 12.5. By contrast, statements made in the presence of a third party are usually not privileged because there is then no reasonable expectation of confidentiality. State v. Colton,174 Conn. 135, 138-39, 384 A.2d 343 (1977); McCormick, Evidence (2d Ed. 1972) 91, p. 188.' State v. Cascone, 195 Conn. 183, 186, 487 A.2d 186
(1985). The presence of certain third parties, however, who are agents or employees of an attorney or client, and who are necessary to the consultation, will not destroy the confidential nature of the communications. State v. Cascone, supra, 186-87 n. 3." State v. Gordon,197 Conn. 413, 423-424, 504 A.2d 1020 (1985); see State v. Eagan,37 Conn. App. 213, 216, 655 A.2d 802 (1995).
"The burden of proving the facts essential to the privilege is on the person asserting it. [citations omitted.] This burden, includes, of course, the burden of proving the essential element that the communication was confidential." State v. Hanna, 150 Conn. 457, 466,191 A.2d 124 (1963). Here, Pcolka has not carried that burden. The attorney-client privilege is strictly construed. Turner's Appeal,72 Conn. 305, 318, 44 A. 310 (1899). With respect to the persons present other than Pcolka and his attorney, "even if we might predicate a desire for confidence by the client, the policy of the privilege would still not protect him, because it goes no further than is necessary to secure the client's subjective freedom of consultation." 8 Wigmore on Evidence (McNaughton rev. 1961) § 2311, pp. 602-603.[27] The plaintiffs' motion to compel with respect to communications made in the meeting with the Diocese and its attorney is granted.
Order accordingly CT Page 6751
Bruce L. Levin Judge of the Superior Court